[No. F026472. Fifth Dist. Feb. 9, 1999.]

KAREN GAYLE SUMMERS et al., Plaintiffs and Respondents, v.
A. L. GILBERT COMPANY et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

Borton, Petrini & Conron, J. Curtis Cox and Bradley A. Post for Defendants and Appellants.

Daniel U. Smith; Law Offices of William L. Veen, William L. Veen and Cynthia McGuinn for Plaintiffs and Respondents.

OPINION

**WISEMAN, J.**—On March 12, 1993, a tragedy occurred which forever altered the lives of the Summers family. Jerry Lee Summers was driving his pickup truck and became involved in an accident with a truck pulling two trailers filled with corn. Based on a series of events, the two trailers became detached and one tipped over onto Jerry's truck, burying it in corn. In a few short moments, a husband and father of two children was gone forever.

A wrongful death action was filed against multiple defendants alleging theories of liability based on nondelegable duty, negligent hiring and retention of an incompetent contractor, and under the doctrine of respondeat

superior. By the time of trial, two of the three remaining defendants included Cotton, owner of the truck and trailers, and Gilbert, owner of the corn.

On January 22, 1996, a legal tragedy occurred which, unfortunately, will also alter the lives of the Summers family. The Summerses' counsel called as an expert witness Ellis Anderson, a lawyer who specializes in the field of transportation and practices primarily before the Public Utilities Commission. Anderson had an opinion on almost every imaginable subject related to the case. And he was allowed to testify to these opinions to the jury over one entire trial day. Anderson opined that Gilbert had a nondelegable duty; Cotton was hauling illegally; Gilbert's contracts with Cotton were illegal; Gilbert was legally required to be registered as a contract carrier rather than a private carrier; and Gilbert was *liable* for Cotton's acts under the doctrine of nondelegable duty, respondeat superior and negligent hiring of an incompetent contractor. Anderson even pulled out his proverbial crystal ball and predicted what future Courts of Appeal would do with respect to the current regulation of transportation in California.

So why is this a problem? Simply put, Anderson, under the direction of the Summerses' counsel, completely overstepped his legal bounds. He was a *witness*, not the judge. Both state and federal courts have held that expert testimony on issues of law is not admissible since it the judge's responsibility to instruct the jurors on the law—not that of the witness. The reason is that the lawyer-expert who expounds on the law usurps the role of the trial court. This is a particular problem when, as in this case, the trial court's instructions fell far short of the opinions expressed by Anderson.

We are left asking ourselves: If the law on nondelegable duty is clear, and there was ample evidence to support a finding of negligent hiring, why go after a gnat with a sledgehammer by having a lawyer testify on the law as an expert witness? We have no answer. The judgment is reversed.

## PROCEDURAL HISTORY

Karen Gayle Summers brought suit for the wrongful death of her husband, Jerry Lee Summers (decedent), on behalf of herself and as guardian ad litem for her two children, Jeffrey and Kristy Summers (plaintiffs). Prior to trial, all the defendants settled, with the exception of Maurice Cotton, Sr., doing business as Cotton Trucking (Cotton), A. L. Gilbert Company, a California corporation, A. L. Gilbert Company, doing business as Berry Seed and Feed Company, Berry Seed and Feed Company (referred to collectively as Gilbert), and Manuel Dutra, an employee of Gilbert.

At the conclusion of the trial, the court granted a motion for nonsuit against Dutra. The jury found Cotton's negligence was a legal cause of

damage to plaintiffs. The jury also found Gilbert failed to exercise reasonable care to hire and retain a competent contractor, Cotton, and that the work performed by Cotton involved an unreasonable risk of physical harm to others unless performed with care and skill. The jury further found Gilbert's hiring and retention of an incompetent contractor, Cotton, was a legal cause of damage to the plaintiffs and the activity for which Gilbert hired Cotton involved an unreasonable risk of physical harm to others unless performed with care and skill. Finally, the jury found Cotton was an independent contractor. The jury awarded plaintiffs economic damages in the amount of $482,468, and noneconomic damages in the amount of $2,625,000. The jury apportioned 50 percent of the negligence and wrongful conduct to Cotton and 50 percent to other persons. The jury also assessed $60,000 in punitive damages against Cotton.

After a setoff for $430,000 in settlements received from other parties, and reduction of the noneconomic damages by 50 percent, a net judgment of $1,728,189 was entered against Cotton and Gilbert. In addition, interest and costs were awarded to plaintiffs.

Gilbert filed a timely appeal, raising eight contentions: (1) the trial court erred in admitting expert testimony regarding conclusions of law; (2) the trial court erred in admitting evidence of sorrow, grief and emotional distress in an action based on wrongful death; (3) the trial court erred in admitting speculative evidence concerning the decedent's prospective earnings; (4) the damages were excessive as a matter of law; (5) the special verdict form used was inadequate to establish Gilbert's liability for negligent hiring; (6) the trial court erred in several instructions given to the jury; (7) as a private carrier, Gilbert was not liable as a matter of law for Cotton's actions under the doctrine of nondelegable duty; and (8) the trial court erred in admitting evidence of Cotton's financial irresponsibility.

## FACTUAL HISTORY

On the morning of March 12, 1993, decedent was driving his pickup truck southbound on Faith Home Road, in a rural part of Stanislaus County. That same morning Oswaldo Comacho was also on Faith Home Road, driving north in a truck owned by Cotton. The truck was pulling two trailers loaded with corn for delivery to Gilbert's milling facility, Berry Seed and Feed Company. The speed limit on Faith Home Road was 55 miles per hour. Decedent and Comacho approached an intersection where Monte Vista Avenue meets Faith Home Road at approximately the same time. Monte Vista Avenue ended at Faith Home Road. There was a stop sign at the intersection which controlled traffic on Monte Vista, but no stop sign on

Faith Home Road. As decedent and Comacho approached the intersection of Faith Home Road and Monte Vista Avenue, Barney Migliori was driving eastbound on Monte Vista Avenue.

When Migliori came to the stop sign at Faith Home Road, he stopped and looked to his left (north) and saw a pickup truck approximately 500 to 600 feet away coming toward him with its left turn signal on. This truck was driven by Manuel Dutra, an employee of Gilbert. Migliori then looked to his right, but his vision was obscured by a tree in an orchard immediately to his right (south), so he pulled forward a little more. Migliori claimed he did not see any traffic to his right, so he pulled forward another 15 feet, and looked to his left again. At this point, Migliori stated Dutra's vehicle was approximately 200 feet away from the intersection and had its right turn signal on. Migliori testified he then looked to his right and could see approximately 350 feet down Faith Home Road. He did not see any vehicles approaching from the right, so he began a left turn onto Faith Home Road. After he completed his turn, Migliori heard an air horn, looked in his rearview mirror and saw a large truck bearing down on him. Migliori attempted to accelerate and steer to his right to avoid a collision, but was unable to do so. Migliori's vehicle was struck by the truck driven by Comacho and spun around.

Dutra testified he was driving south on Faith Home Road approaching Monte Vista Avenue with a pickup truck driven by decedent approximately 300 to 400 feet behind him. Dutra estimated decedent was driving at approximately 30 miles per hour at the time. As he approached Monte Vista Avenue, Dutra turned on his right turn signal and saw Migliori's vehicle stopped at the stop sign. Dutra stated he never turned on his left turn signal. As he approached Monte Vista Avenue, Dutra could see Migliori's face looking at him the entire time, and never saw him look to the right. Dutra testified the truck driven by Comacho was very close to the intersection of Faith Home Road and Monte Vista Avenue when Migliori pulled out in front of it. Dutra recalled the sound of the truck's air horn, and the impact of the truck hitting Migliori's vehicle occurred almost simultaneously. Dutra opined there was nothing the truck could have done to avoid the accident.

William Jackson owned a home on the east side of Faith Home Road, set back approximately 360 feet from the road and approximately 477 feet from the intersection of Faith Home Road and Monte Vista Avenue. On the morning of March 12, 1993, he had just stepped out onto the back porch of his home when he saw Migliori's vehicle stopped at the intersection. Jackson also saw the truck driven by Comacho approaching the intersection at what he estimated to be 50 miles per hour. Jackson testified Comacho's truck was only a short distance (approximately 50 feet) from the intersection when

Migliori pulled out into its path. He stated the truck began blowing its horn before Migliori began his turn and that the collision occurred less than a second after the horn blast stopped. Jackson stated Migliori's vehicle was struck by the truck before it had completed the turn onto Faith Hope Road and there was no way the truck could have avoided the collision. Officer James Pang of the California Highway Patrol conducted an investigation of the scene of the accident and also opined that Migliori's vehicle may not have completed its turn onto Faith Home Road when it was struck by the truck driven by Comacho.[1]

After striking Migliori's vehicle, Comacho's truck went across the center-line of the road and struck decedent's pickup truck which was on the shoulder of the road, causing it to overturn. The two trailers became detached from Comacho's tractor as a result of the impact and one of them tipped over on decedent's pickup truck, burying it in corn. It was stipulated that decedent's death was the result of positional asphyxiation and that he survived the collision a sufficient period to satisfy the requirements for a survivorship action.

Officer Lewis White, a mobile road enforcement officer for the California Highway Patrol, responded to the scene of the accident on March 12, 1993. White testified the two trailers were still connected when he arrived. He conducted a visual inspection of the truck driven by Comacho and found the "fifth wheel" plate which attaches the trailer to the tractor had pulled completely away from the first trailer, causing it to separate from the tractor. White also found a tear in the fifth wheel plate approximately seven inches long, which he opined had been present for some time prior to the accident because there was evidence of rust along the tear. White observed the safety cable between the first and second trailer was rusted with numerous broken strands. He stated this defect was obvious from approximately 10 to 15 feet away. Finally, White observed that one of the air lines for the brakes running from the tractor to the trailer was ruptured and repaired with duct tape. White stated this tape was also visible at a distance of 10 to 15 feet.

In addition to his visual inspection of the truck driven by Comacho, White inspected the truck's brakes after it had been towed from the scene. As a result of this inspection, White determined that both front brakes on the tractor were so far out of adjustment as to require it to be placed "out of service." Additionally, he found the brakes on the third axle and the right brake on the fourth axle to be inoperative. White also found there was an air leak in the left brake on the fourth axle. Finally, White determined the right brake on the fifth axle was out of adjustment, which decreased its efficiency.

---

[1] After the accident Comacho disappeared and neither party was able to locate him.

White noted a tire on one of the trailers had less than two thirty-seconds of an inch of tread on it. White testified he did not note any damage to the brakes which appeared to be the result of the collision, and that in his opinion, the defects he detected were preexisting at the time of the accident. Based on his inspection, White concluded the truck driven by Comacho was unsafe at any speed.

White testified he had stopped trucks owned by Cotton prior to March 12, 1993, at least six times. On each occasion there was something wrong with the truck which required it to be put out of service. White stated he had previously cited trucks owned by Cotton seven times for having brake violations.

Michael Allison, a traffic accident reconstructionist, testified for plaintiffs. Based on the results of White's inspection, Allison estimated the truck driven by Comacho had only 50 percent of its total braking capacity available on the date of the accident. Based on consideration of the photographs of the accident scene, Allison calculated Migliori's vehicle was approximately 60 feet north of the intersection of Monte Vista Avenue and Faith Home Road traveling at a speed of 16 miles per hour when it was struck by Comacho's truck. Allison estimated Comacho was driving between 50 and 55 miles per hour as he approached the intersection and was approximately 400 feet from the point where he struck Migliori's truck when Migliori began his turn onto Faith Home Road. However, based on his analysis of the photographs of the scene of the accident, Allison was of the opinion that Comacho did not begin to apply his brakes until he was 15 feet away from Migliori's vehicle. Based on his calculations, Allison concluded that if the truck driven by Comacho had adequate brakes and Comacho applied them in time, he would have avoided striking Migliori's vehicle altogether. Additionally, Allison concluded that even with brakes that were only 50 percent efficient, if Comacho had reacted properly and applied his brakes when he first realized Migliori was pulling in front of him, he would have struck Migliori's vehicle, but not decedent's.

At the time of decedent's death, Gilbert was in the business of milling dairy feed. Gilbert would purchase corn and other grains as well as other ingredients which it then milled at its facilities and distributed to its customers. One of these facilities is Berry Seed and Feed Company. Gilbert maintained a fleet of trucks and trailers used primarily for delivering the final milled feed to its customers. However, on occasion Gilbert would hire independent contractors to perform this task. Gilbert usually employed independent truckers only to haul the corn and other grains to its facilities for milling. Occasionally, Gilbert would also use one of its trucks to haul

corn or grain to its facility for milling. Some of the corn Gilbert purchased was received by rail at Foster Commodities. On the morning he was involved in the accident, Comacho was hauling corn from Foster Commodities to Berry Seed and Feed Company.

In order to maintain its fleet of tractors and trailers, Gilbert maintained a maintenance facility at Berry Seed and Feed Company, employing seven mechanics. Gilbert was registered as a "private carrier" by the California Public Utilities Commission (PUC) and complied with all the safety requirements for operating trucks in California. It was Gilbert's policy not to do any maintenance work on the trucks driven by the independent contractors it hired. When it hired an independent contractor to haul its products for the first time, Gilbert reviewed the contractor's PUC licenses. However, Gilbert never did any follow-up checks to determine if the contractor maintained the appropriate license. Neither did Gilbert ever request a copy of the Management Information System of Terminal Evaluation Records (MISTER) Report maintained by the California Highway Patrol (CHP) on any of the independent contractors it hired. This report was available to the general public and provided a detailed history of a carrier.

Cotton was one of many independent contractors which Gilbert hired to haul corn and other products to its milling facilities. As of the date of the accident, Cotton had been hauling products for Gilbert approximately 10 years. Although Cotton hauled goods for other customers, most of its business prior to the date of the accident involved hauling for Gilbert. Maurice Cotton, who founded Cotton Trucking, had one of the oldest PUC licenses in the state of California. On the date of the accident, Maurice Cotton was in his 70's and had turned the day-to-day operation of the family business over to one of his sons, Marvin Cotton. Maurice stated he never heard of the Biennial Inspection of Terminals (BIT) Program, and no one from the CHP had ever inspected his facility. Maurice testified that if asked by anyone for whom he hauled goods, he would have stated Cotton was properly licensed to carry agricultural products, and complied with all safety and maintenance programs required by the state.

Marvin Cotton testified he was responsible for maintaining and servicing Cotton's trucks. He did much of the maintenance himself, and if he had a problem which he could not handle he would refer it to one of the mechanics he used. Marvin stated if anyone had asked him prior to the date of the accident, he would have said Cotton maintained the proper licenses and complied with all required safety and maintenance programs for its trucks. Marvin claimed he instructed all Cotton's drivers to inspect their vehicles each morning before they left. Marvin testified this safety inspection included checking and adjusting the brakes on the trucks. Marvin stated he was

present the morning of March 12, 1993, and assisted Comacho in inspecting his truck. Marvin claimed this inspection included checking the brakes on the truck, and they were operating correctly. He also claimed there was no duct tape on any air lines on Comacho's truck when it left the Cotton facility that day.

In 1991, Cotton had a highway contract carrier permit and an agricultural carrier permit. However, in September 1991, the PUC revoked both permits, and Cotton only applied for reinstatement of the agricultural carrier permit. Cotton's agricultural carrier permit was reinstated, but either revoked or suspended at least five times before the date of the accident. It was last reinstated on March 1, 1993, after having been suspended on January 19, 1993. All the suspensions and revocations related to Cotton's failure to provide the PUC information concerning its financial responsibility.

In 1989, the State of California implemented the BIT program, which required every motor carrier to submit an application for a BIT inspection. This program required the inspection of any truck terminal every two years. It was stipulated that at the time of the accident, Cotton had not complied with the requirements of the BIT program. Also, California law mandates a 90-day maintenance program for all trucks operating in the state, and requires a daily inspection of every truck prior to operation to ensure it is in a safe condition and in good working order. Cotton did not have such a program prior to the date of the accident. Additionally, the California Vehicle Code prescribes a preventative maintenance program for trucks, which includes a requirement that the carrier maintain records of the maintenance performed for at least 30 days. Cotton was unaware of the requirement to maintain the maintenance records on its trucks and did not do so.

When a truck delivered corn or other products to Berry Seed and Feed Company, it would drive onto the scales which were about 10 feet from one of the windows in the office building. When the truck was on the scales, all that could be seen from the window was the trailer. Once the truck was weighed, it would be directed to another portion of the facility where it would be unloaded under the supervision of an employee of Berry Seed and Feed Company. It would normally take approximately 30 minutes for a truck to off-load the grain it was carrying in this manner. Trucks may stay at the facility longer, depending on the number of trucks in line to deliver products.

In the six months prior to the date of the accident, Cotton trucks made close to one thousand deliveries to Berry Seed and Feed Company. However, no employee or officer of Gilbert testified they had ever seen or heard of any problem with Cotton's trucks or ever seen or heard of them breaking

down at Berry Seed and Feed Company. Neither did anyone from Gilbert testify they were aware Cotton had had its PUC license as an agricultural carrier suspended or revoked. Marvin Cotton claimed that prior to the date of the accident, he never had a truck break down while it was at Berry Seed and Feed Company; never complained to Gilbert personnel there that he had a maintenance problem or requested their assistance; and no one at Berry Seed and Feed Company ever assisted him in the maintenance of one of Cotton's trucks.

Kevious Keller, Marvin Cotton's cousin, testified he worked as a driver for Cotton in 1993. He was the primary driver of the truck driven by Comacho on March 12, 1993, and had never experienced any maintenance problems with it. He stated he checked the brakes regularly and they worked efficiently when he had to make an emergency stop. Keller had taken a day off work on the day of the accident, but went to Cotton's facility because he discovered he had left his wallet in the truck. When Keller found the truck was not at Cotton's facility he went to Berry Seed and Feed Company, where he found the truck in line waiting to deliver its cargo. Comacho told Keller he had a leak in one of the air hoses for the brakes and Keller repaired it with some duct tape. Keller testified he told Comacho to park the truck because it was unsafe, and to contact Marvin Cotton.

Keller also stated he never broke down at Berry Seed and Feed Company while driving this truck, but that on occasion corn would leak from cracks in the trailers, and someone at Berry Seed and Feed Company would tell him to fix the problem. On one occasion Keller wished to adjust his brakes and asked if he could borrow a wrench from Berry Seed and Feed Company's maintenance facility. However, no one would give him one because of the company policy against working on independent contractor's trucks. Keller claimed Cotton was complying with the BIT program and the CHP inspected Cotton's facility once before the date of the accident.

Parish Piggee worked for Cotton for a period of time prior to the date of the accident. Piggee testified he broke down on the scales at Gilbert's facilities a "couple of times" while driving Cotton's trucks. This occurred at least once at Berry Seed and Feed Company when the gearshift lever in his truck broke. He claimed on another occasion when his truck broke down while waiting in line at Berry Seed and Feed Company, he had to be towed by Marvin Cotton. Piggee testified that one time the accelerator pedal came off one of Cotton's trucks while he was driving it. He also stated he almost had an accident once when he put the brakes on to avoid a car that had pulled in front of him on the freeway. Because the brakes were not adjusted correctly, his truck spun 360 degrees. Piggee testified rivets on Cotton's trailers were always popping out and causing corn or other material to leak

and he would use duct tape to repair them. Piggee heard at least one employee of Gilbert, named Jerry, who worked at its Farmer Warehouse facility, refer to Cotton's trucks as "junk." Piggee claimed he also heard both Marvin Cotton and Maurice Cotton, Jr., refer to their trucks as "old junk." Piggee claimed there was no policy at Cotton for a driver to check his brakes every day, and he did not do so. Piggee claimed he was terminated by Cotton because he was late to work, and denied Keller's allegation he had been terminated because he was using illegal drugs while on the job.

## DISCUSSION

### I. *The lawyer as an expert witness*

Gilbert contends the trial court erred when it permitted Ellis Anderson, a lawyer specializing in the field of transportation, to testify as an expert. Anderson, who practiced primarily before the PUC, was offered to provide his opinions regarding whether Gilbert: had a nondelegable duty; was liable for the negligent hiring of an incompetent contractor; and was liable under the doctrine of respondeat superior.

Gilbert concedes the jury's determination that Cotton was an independent contractor renders moot the issue of whether it was error to allow Anderson to give an opinion on the issue of respondeat superior. However, Gilbert claims Anderson's opinions on whether Gilbert had a nondelegable duty with respect to Cotton and whether Gilbert was liable based on the negligent hiring and retention of an incompetent contractor, involved legal questions which were not a proper matter for expert testimony. Gilbert claims Anderson's testimony invaded the province of the court because his opinion involved instructing the jury on the law applicable to plaintiffs' case. Gilbert argues that allowing Anderson to testify as an expert could have led the jury to believe he knew more about transportation law than the court, thereby inviting them to adopt his view of the applicable law rather than that contained in the court's instructions.

### A. *Standard of review*

■ A trial court's determination that expert testimony is admissible is reviewed for an abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 266 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People v. Johnson* (1993) 19 Cal.App.4th 778, 787 [23 Cal.Rptr.2d 703].) Additionally: " '[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard.

Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness." ' [Citation.]" (*People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 [283 Cal.Rptr. 382, 812 P.2d 563].) Although a trial court has a great deal of discretion when it comes to admitting expert testimony, "this discretion is not absolute. [Citation.]" (*McCleery* v. *City of Bakersfield* (1985) 170 Cal.App.3d 1059, 1068 [216 Cal.Rptr. 852].)

## B. *Analysis*

### 1. *Anderson's testimony*

Prior to trial, Gilbert moved to exclude the testimony of Anderson on the ground his expert opinion related to a question of law, i.e., whether Gilbert had a nondelegable duty. Plaintiffs responded to Gilbert's motion *in limine*, claiming Gilbert was "mischaracterizing the nature of [Anderson's] testimony." Plaintiffs contended Anderson's opinion would be on an issue of fact, not a question of law, i.e., that Gilbert was operating under a public franchise. Plaintiffs then claimed "it would seem proper for Mr. Anderson to opine even as to the ultimate issue of whether there is vicarious liability. However, Mr. Anderson's opinion does not appear to go that far *yet*. Accordingly, Mr. Anderson's testimony is well within the ambit of acceptability and, more importantly, well within the range of admissibility." (Italics added.)

Plaintiffs attached a copy of Anderson's declaration to the opposition to Gilbert's motion *in limine*, ostensibly for the purpose of establishing his opinion was admissible and to dispel any misrepresentation by Gilbert concerning the nature of his opinion. However, review of Anderson's declaration supports the conclusion that if there was any misrepresentation of the nature of his opinion, it was by plaintiffs. The first sentence in Anderson's declaration provides: "I, Ellis Ross Anderson, present this declaration in furtherance of my conclusion, as an expert on California and federal regulation of motor carriers, and the responsibility/liability to the public necessarily arising from that regulation, that Defendant A.L. Gilbert Company ('Gilbert') is *vicariously liable* for the acts or omission of Defendant Cotton Trucking and its principals." (Italics added.) Anderson's declaration goes on to refute Gilbert's claim that the nondelegable duty doctrine does not apply to private carriers. He opines "Gilbert cannot avoid the application

of this doctrine because it holds authority as a private carrier." Therefore, at the time of the accident, Gilbert operated pursuant to a "public franchise." Anderson's declaration also purports to distinguish the cases relied upon by Gilbert and list applicable federal regulations.

The court denied Gilbert's motion *in limine* on the grounds that Anderson's opinion was on a factual issue:

"With regard to ruling on Defendant Gilbert's Number Seven, which would preclude Mr. Anderson from testifying or giving an opinion that defendant Gilbert has a nondelegable duty as it relates to the acts of Cotton Trucking, Mr. Anderson can testify and give an opinion whether the defendant Gilbert had a nondelegable duty. This is a factual opinion based on the evidence made known to Mr. Anderson and his understanding of California law.

"While Mr. Anderson can testify as to his understanding of California law, and that being the basis of his opinion, or at least part of the basis of his opinion, he can not testify as to what California law actually is, and the jury will be instructed that the law is what the Court tells them that it is, not what a witness thinks that it is."

Prior to Anderson being called as a witness, Cotton requested the court reconsider its ruling, again claiming his expert opinion went to an issue of law. The court declined to reconsider, claiming Anderson's opinion was akin to an attorney or doctor testifying to the standard of care in a legal or medical malpractice case:

"I've made a ruling treating this somewhat analogous to whether or not a doctor or an attorney met the standard of care on a medical or legal malpractice suit.

"The Court's going to allow Mr. Anderson to give an opinion whether or not Cotton—excuse me, Gilbert's had a nondelegable duty.

". . . . . . . . . . . . . . . . . . . . . . .

". . . That's right. He can't say the California law's A, B, C, and D. He can say it's his understanding what it is, so far as it's necessary for him to render an opinion whether or not there's a nondelegable duty."

Gilbert then objected to Anderson expanding his testimony to address Cotton's permit to haul agricultural goods as well as the ownership of corn

carried by Gilbert and the independent truckers it hired. The court refused to grant Gilbert's motion to exclude this testimony.

When Anderson was called as a witness, the court gave the jury the following cautionary instruction:

"Ladies and gentlemen, you will recall that earlier I told you that so far as facts and evidence, it's generally your discretion to decide. As to what the law is, I'll be instructing you as to what the law is at the end of the case. And again you have to accept what I say the law is, not what the attorneys say or not what Mr. Anderson says.

"Mr. Anderson may be telling you his opinion as to what the law is in support of any other opinions he gives you. Now, if I were to tell you that the law is this or the law is that and that happened to match Mr. Anderson's opinion as to what the law is, then that might support his other opinions.

"If what I tell you the law is is contrary to what Mr. Anderson opines the law is, then that might detract from any other opinions he has."

As a prelude to voicing his opinion, Anderson explained the information he relied upon in reaching his conclusions. He stated this information included "my file relative to the PUC's decisions as they might affect this since—since the early '50s, and looked at the Vehicle Code to the extent— the California Vehicle Code, which is where the law is set forth with regard to some safety operations, and the California Public Utilities Code." Plaintiffs then gave Anderson a lengthy hypothetical set of facts based on the evidence they believed would be presented. At one point during the course of the recitation of these facts, Anderson interrupted plaintiffs' counsel to remind him to emphasize a fact from the case:

"[Plaintiffs' counsel] That Gilbert paid Cotton weekly where Cotton would actually show up and ask for his check on a weekly basis based on invoices. That Gilbert knew that Cotton was having financial difficulties. Gilbert knew and had loaned money to Cotton, interest free, on occasion and had taken out—

"A. [Anderson] Without any documentation, wasn't it?

"Q. And there was no documentation for the loans, . . . ." Anderson then offered his opinion that Gilbert had a duty to make sure Cotton was operating safely. "And in my view, Gilbert can't put Cotton on the road without being sure that Cotton is safe under the circumstances."

Additionally, over Gilbert's objection, Anderson opined that failure of a trucking company to register with the PUC means it is operating illegally:

"Q: Okay. So unless you do that, you don't even exist as far as the overall regulatory system unless you're somehow apprehended—is that correct? —unless you register?

"A: That's correct. You're operating illegally unless you register.

"· . . . . . . . . . . . . . . . . . . . . . .

"Q: And if you hire somebody to perform work or activity for which there's no license, they may have a subsidiary license but they have no license to perform that kind of work or activity, they would likewise be operating illegally, correct?

"A: The—if that's a—I want to say yes, but there are circumstances under which I could hire a trucker and that operation could be legal. For example, if I want to treat that trucker as an employee, he doesn't need a license. If I want to treat that trucker as my—as my employee, then he can operate under my particular authority.

"But in the absence of that kind of relationship, nobody can run a truck up and down the road without the benefit of either their license or somebody else's license in that context." Anderson then went on, over Gilbert's objection, to comment at length on whether hiring an unlicensed carrier was an "illegal" act:

"Q: And so if I hire somebody to perform work and they have not complied with this character of the law, I'm basically hiring that person to perform an illegal act?

"A: That would be correct.

"Q: Again you talked about illegal agreement. Would that be an illegal agreement, to hire somebody to perform work which is illegal in nature?

"A: In my view it would. It would be no different than trying to hire somebody to practice law that doesn't have a license to practice law."

At one point Anderson also prompted plaintiffs' counsel to ask him questions about the "pull notice program" so that he could explain it to the jury:

"THE WITNESS: Mr. Veen, are you going to explain what the pull notice program is? Because the jury's not going to understand." After objection by

Gilbert, the court struck this comment. However, Anderson was permitted to testify at length concerning his understanding of the meaning of the term respondeat superior and the public policy considerations behind it. Additionally, over Gilbert's objection, Anderson explained his understanding of the doctrine of nondelegable duty:

·"THE WITNESS: If—I have the responsibility to act safely on the road, to perform transportation services in a safe and prudent manner. I may not—I may not avoid that responsibility by having somebody else do it for me, even if that somebody else is a licensed independent contractor. I as a matter of public policy am not permitted to in effect step away from the liability.

"And the basis for that is this: You're not going to permit somebody to get involved in the trucking business and then to freely hire people that aren't appropriately safe and duck the responsibility for it.

"The—it's the flip side of the coin. You get a privilege. You can be a trucker. You registered. The flip side of that coin is *you're responsible for any activity that occurs and arises out of that, regardless of whether that's activity of your employee or the activity of somebody else that is licensed.*" (Italics added.)

Anderson's comments concerning nondelegable duty did not stop there. He went on to state his opinion concerning the viability of the doctrine:

"A. Not necessarily inherent dangers, but just potential dangers. Trucking is one of those activities. So the concept that we have got, this notice that you've got a responsibility once you get a franchise carrier permit, comes in with a vengeance as the danger of the activity or as the complexity of the activity increases.

"And, as a consequence, the *concept of nondelegable duty as to truckers in 1993 is incredibly viable.* . . .

"And the one is that you've gotten derivative certain responsibilities, and the activity is potentially dangerous. And that means that if you're a trucker, you may not duck the responsibility just by handing the baton to somebody else in a particular instance.

"That's the doctrine of nondelegable duty. I can't duck the responsibility. It's mine.

"Q: Can I call him an independent contractor and duck the responsibility?

"A: I don't care if he's an independent contractor or not. I wouldn't care if Cotton retained Gilbert. It doesn't make any difference. The entities that have the license may not delegate their responsibilities to the public under proper understanding of the way in which these entities are currently regulated.

"Q: *We talked about duties. They both then are—legal responsibility is on both entities then?*

"A: *If you have two. If you have two carriers, both of them have independent responsibility. Both of them are, both of the participants are liable for the consequences that occur with regard to a joint activity. They're equally liable under this notion.*" (Italics added.)

In the event the jury somehow failed to grasp the significance of Anderson's opinion, plaintiffs asked him again to state his opinion on whether Gilbert was liable:

"MR. VEEN: Q. In light of the assumptions—let me try it again. Gilbert has a private carrier license, has the characteristics that we just discussed. It hires Cotton for its use, for its own benefit, to haul its corn from one location to another. Cotton has an ag permit on and off, but on the particular day of the accident the ag permit is in effect.

"Regardless of what Cotton is hauling, and regardless of whether it's within the context of his ag permit, but just Cotton is hauling Gilbert's product, do you have an opinion within the relationship as to whether or not Gilbert is subject to this nondelegable duty aspect of the law? Do you have an opinion in that regard?

"A. I do.

"Q. What is that opinion?

"A. *Gilbert may not delegate its duties to ensure public safety in connection with that operation to Mr. Cotton. Gilbert stays on the hook.*

"Q. *So if Cotton gets in an accident for which he's legally responsible, then Gilbert is legally responsible?*

"A. *That's correct.*

"Q. *They're both legally responsible?*

"A. *That's correct.*" (Italics added.) Anderson was also allowed to explain the legal basis for his opinion.

"A. There's no published case relative to it that has undertaken, no court that's undertaken, to analyze the current environment. I'll tell you that. You know, 1993 where the concepts, the concepts are reasonably recent, you know how long it takes for these things to grind through the court. So there's no published case on appeal which evaluates the current regulation of transportation in California. *There will be.*" (Italics added.)

Over Gilbert's objection, plaintiffs elicited Anderson's opinion on whether Gilbert was a contract carrier notwithstanding the fact it only had a license as a private carrier:

"Q. Okay. Now, in looking at the various documents, do you have an opinion as to whether or not, apart from Gilbert acting as a private carrier, that Gilbert is also acting as a highway contract carrier, albeit without a license for being a highway contract carrier?

". . . . . . . . . . . . . . . . . . . . . . . .

"THE WITNESS: It is my view that Gilbert in a program that it calls the prepaid program is regularly putting its drivers and its trucks on the road transporting the product of somebody else, namely, feed and seed and other kinds of things that are owned by people that Gilbert does not—does not—well, owned by people other than Gilbert.

"And under the circumstances as I read the depositions and looked at the documents, that transportation which is separately invoiced, sometimes Gilbert puts its trucks on it, sometimes it hires somebody else. That is a for hire activity." Anderson added that he was of the opinion that Gilbert was liable regardless of whether it was considered a private carrier or contract carrier.

When plaintiffs attempted to ask Anderson questions concerning the standard applicable to Gilbert's hiring of Cotton, the court sustained Gilbert's objection:

"THE COURT:—Anderson will not be testifying on the—with regard to any expertise dealing with the negligent hiring of an independent—excuse me, the negligent hiring of an incompetent trucker." Despite this ruling, plaintiffs did elicit testimony from Anderson on the standards regarding negligent hiring of an incompetent trucker:

"Q. And are you familiar with the standards as far as how carriers are retained by those that hire them?

"A. I am.

"Q. And as far as a carrier, I'll put this in a hypothetical. A carrier with this kind of a facility, hiring a trucker with a tractor that's 24, 25 years old and trailers that are old and that they're obviously old, is there any greater need to make further inquiry into those conditions?

"A. Well, yeah. I think a trucker who hires a trucker, because he or she is going to be liable for the activities of that trucker, would in any event inquire into the nature of the person that he was hiring, you know. Where I'm going to have you do something for me, and if you screw it up I'm going to be liable for it, I'm going to be pretty darned careful with regard to what—what I'm doing. So in a sanitized context, truckers check to make sure that truckers they hire, because of this responsibility, are licensed and are safe operators, because they're going to get stuck with the responsibility if they're not.

"That situation, that thing is increased radically when you hire a trucker that—that is operating on the fringe and you know they're operating on the fringe. And when you hire a trucker day in, day out, day in, day out, day in, day out, as a captive trucker the level of concern about this on the part of this trucker who is going to be stuck with responsibility for that goes up, in my experience." When plaintiffs' counsel questioned Anderson concerning the use of the term "stuck," Anderson responded: "I didn't mean to use a term you didn't like, Mr. Veen."

Anderson also offered his opinion that all the loads carried by Cotton for Gilbert in the six months prior to the accident were "unlawful," and there existed a principal-agent relationship between Gilbert and Cotton. Plaintiffs ended their direct examination of Anderson with the following questions:

"Q. Is there any way that Gilbert could have avoided all legal responsibility for the acts of Cotton, in other words?

"A. Yeah.

"Q. What is that?

"A. Don't act as a trucker."

On cross-examination, Gilbert attempted to question the basis for Anderson's opinion that it was subject to a nondelegable duty with respect to Cotton and received the following exposition on the law:

"A. No court has declined to apply it. I don't mean to be argumentative with you. I know of no case which—I know of no case law which extends that concept of nondelegable duty to the private carrier.

"The basis of my testimony wasn't the existence of case law though. The basis of my opinion on that subject was to look at the reasons and the predicates that the courts have historically provided that you couldn't delegate your duties, to compare those to the—to the criterion in 1993 that were applied to a private carrier of a for hire carrier, and to tell you, Mr. Post, in that context that there's no distinction at all. There's no reason that the courts, fully informed, won't apply it, given the current regulations over transportation in the state of California."

On redirect examination, plaintiffs provided Anderson a variation in the original hypothetical set of facts concerning the percentage of Cotton's business that was with Gilbert and then asked if it changed his opinion concerning Gilbert's liability:

"Q. Does it have any effect on any of your opinions? I believe you said—

"A. No, it doesn't.

"Q. Okay. *And we're talking about three separate bases of legal responsibility.* We're talking about the nondelegable duty being an independent basis. Does it have any effect?

". . . . . . . . . . . . . . . . . . . . . . . .

"THE WITNESS: It doesn't have any effect.

"MR. VEEN: Q. Okay. *The negligent retention of an incompetent contractor?*

"A. *It doesn't have any effect.*

"Q. Respondeat superior within the context that we have discussed?

"A. It doesn't have any effect. . . ." (Italics added.)

At the conclusion of trial, in response to Gilbert's motion for a directed verdict, the court ruled:

"I am going—I plan on finding that Gilbert was a private carrier, but that the 428 restatement nondelegable duty *can still apply* to private carriers, and I am not going to rule as a matter of law that Cotton was either an employee or an independent contractor, which—something that the jury can make a determination on based on the evidence.

"MR. POST [Gilbert's counsel]: When you say that 428 can apply, are you leaving that to the jury's discretion, Your Honor?

"THE COURT: You have argued that nondelegable duty is something that the Court has to decide. Mr. Veen or Miss McGuinn, any response to that?

"MR. VEEN [plaintiffs' counsel]: Well, I think the nondelegable duty as it pertains to a private carrier, we have proffered an instruction. The other part of that is that the work you're hiring the individual to perform has certain characteristics. That I believe does go to the jury, Your Honor."

". . . . . . . . . . . . . . . . . . . . . . . . . . ."

"THE COURT: All right. Then the tentative ruling I announced will become the ruling of the Court." (Italics added.)

## 2. *Limitations on admissibility of expert opinion*

Gilbert's claim of error and Anderson's testimony raise serious questions concerning the proper role of expert testimony in a trial, especially when the purported expert is a lawyer. ██ As a general rule, the opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) Additionally, in California: "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes. (See *Nieves-Villanueva* v. *Soto-Rivera* (1st Cir. 1997) 133 F.3d 92, 100.) There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law. This limitation was recognized by this court in *Ferreira* v. *Workmen's Comp. Appeals Bd.* (1974) 38 Cal.App.3d 120 [112 Cal.Rptr. 232].

In *Ferreira*, the plaintiff filed a workman's compensation claim due to a hernia he suffered. A doctor for the insurance company submitted a report in which he stated: " 'The responsibility for the recurrent left inguinal hernia is, in our opinion, his own and not the responsibility of the employer or his workmen's compensation insurance carrier.' " He further opined: " 'The strain when he lifted the battery out of his truck was not an industrially related injury and we do not believe that the employer or the Aetna Insurance Company should be considered responsible for this condition.' " (*Ferreira* v. *Workmen's Comp. Appeals Bd., supra,* 38 Cal.App.3d at p. 124.) On appeal we held the doctor's report was not admissible evidence. "However, these statements are clearly legal conclusions and not medical opinions and

do not constitute substantial evidence. [Citation.] The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion. [Citation.]" (*Id.* at pp. 125-126.)

Similarly, in *Downer* v. *Bramet* (1984) 152 Cal.App.3d 837 [199 Cal.Rptr. 830], the court concluded expert opinions on legal questions are not admissible regardless of whether the opinion embraces an ultimate issue. In *Downer*, a former wife claimed she had a community property interest in the proceeds from the sale of a ranch conveyed to her former husband by his employer after the parties separated. (*Id.* at p. 839.) At trial, the former wife attempted to introduce expert testimony by her former attorney and an independent attorney regarding the components of an objective test to determine whether the transfer was a gift or deferred compensation. The trial court excluded the testimony. The trial court then granted the former husband's motion for nonsuit. (*Id.* at p. 841.)

On appeal the court denied the former wife's claim that the trial court erred in excluding the expert testimony. It specifically rejected her argument that the opinions were admissible because the Evidence Code allows expert testimony even if it embraces an ultimate issue:

". . . The cited rule does not, however, authorize an 'expert' to testify to legal conclusions in the guise of expert opinion. Such legal conclusions do not constitute substantial evidence. [Citation.] 'The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion. [Citation.]' [Citation.]

"While in many cases expert opinions that are genuinely needed may happen to embrace the ultimate issue of fact (e.g., a medical opinion whether a physician's actions constitute professional negligence), the calling of lawyers as 'expert witnesses' to give opinions as to the application of the law to particular facts usurps the duty of the trial court to instruct the jury on the law as applicable to the facts, and results in no more than a modern day 'trial by oath' in which the side producing the greater number of lawyers able to opine in their favor wins. [Citation.]" (*Downer* v. *Bramet, supra,* 152 Cal.App.3d at pp. 841-842.)

The prohibition against expert opinion on an issue of law has been applied in many contexts. Expert opinion on whether there is probable cause to file suit has been ruled inadmissible in malicious prosecution actions. "Traditionally the existence or absence of probable cause has been viewed as a question of law for determination by the court. [Citation.]" (*Klein* v. *Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 74 [259 Cal.Rptr. 149]; accord,

*Williams* v. *Coombs* (1986) 179 Cal.App.3d 626, 638 [224 Cal.Rptr. 865] ["To the extent that the declarations filed by [the expert] expressed an opinion on the legal question of probable cause, they were inadmissible as improper expert opinion."], disapproved on other grounds in *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863 [254 Cal.Rptr. 336, 765 P.2d 498]; *Leonardini* v. *Shell Oil Co.* (1989) 216 Cal.App.3d 547, 582 [264 Cal.Rptr. 883].) Expert opinion on the legal interpretation of contracts has also been found to be inadmissible. "[T]he meaning of the [insurance] policy is a question of law about which expert opinion testimony is inappropriate. [Citations.]" (*Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d 508]; accord, *Devin* v. *United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1158, fn. 5 [8 Cal.Rptr.2d 263].) The one possible exception to the rule against expert opinion on issues of law can be found in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980].

In *Neal*, the plaintiff brought suit against the defendant for the "bad faith" failure of the defendant to pay uninsured motorist benefits to her. (*Neal* v. *Farmers Insurance Exchange, supra,* 21 Cal.3d at p. 917.) On appeal, the defendant claimed the trial court erred when it permitted two attorneys to testify on behalf of the plaintiff as experts on the subject of bad faith. The defendant contended this was not a proper subject for expert opinion because it was not a matter " 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*Id.* at p. 924.) On appeal, our Supreme Court held the attorneys were properly allowed to testify as experts: "The matter of the admission of expert evidence, however, is one within the sound discretion of the trial court. [Citation.] We can conceive of many ways in which a lay jury, in assessing the conduct and motives of an insurance company in denying coverage under its policy, could benefit from the opinion of one who, by profession and experience, was peculiarly equipped to evaluate such matters in the context of similar disputes. Moreover, the jury was specifically instructed that it was not bound by the opinions of such witnesses but should give such opinions the weight to which they thought them entitled in view of the qualifications and credibility of the witnesses and the reasons given by them in support of their opinions. No abuse of discretion here appears." (*Ibid.*)

Close scrutiny of the court's decision in *Neal* reveals it actually involved an expert opinion on a factual issue rather than a legal one: "*Neal* did *not* involve opinions on the legal question of whether coverage existed (since coverage concededly was present in *Neal*), but instead involved opinions on questions concerning such factual issues as the promptness of the insurer's responses to settlement overtures. [Citation.] Opinions approving the admission of expert testimony as to factual matters such as industry standards for

dealing with covered claims cannot be read to authorize experts to opine in the first instance as to the existence of coverage." (*Devin* v. *United Services Auto. Assn., supra,* 6 Cal.App.4th at p. 1158, fn. 5.)

California is not alone in excluding expert opinions on issues of law. The Federal Rules of Evidence also permit the admission of expert testimony which is helpful to the trier of fact[2] and which embrace an ultimate issue in the case.[3] Notwithstanding this fact, at least eight circuit courts have held expert testimony on issues of law is not admissible. "It is black-letter law that '[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.' [Citation.] At least seven circuit courts have held that the Federal Rules of Evidence prohibit such testimony, and we now join them as to the general rule." (See *Nieves-Villanueva* v. *Soto-Rivera, supra,* 133 F.3d at p. 99.) The federal courts have uniformly held that allowing an expert to voice an opinion on an issue of law usurps the authority of the court: "The basis of expert capacity, according to Wigmore (§ 555), may 'be summed up in the term "experience." ' But experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law. The danger is that the jury may think that the 'expert' in the particular branch of the law knows more than the judge—surely an inadmissible inference in our system of law." (*Marx & Co., Inc.* v. *Diners' Club, Inc.* (2d Cir. 1977) 550 F.2d 505, 512, cert. den. 434 U.S. 861 [98 S.Ct. 188, 54 L.Ed.2d 134]; see *Burkhart* v. *Washington Metro. Area Transit Auth.* (D.C. Cir. 1997) 112 F.3d 1207, 1213 [324 App.D.C. 241] ["Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."].)

The federal courts have also recognized the rule permitting an expert to voice an opinion on an ultimate issue does not affect the admissibility of his or her opinion on an issue of law. "Similarly, Fed.R.Evid. 704(a), which removes the common-law bar on 'otherwise admissible' testimony that 'embraces an ultimate issue to be decided by the trier of fact,' does not vitiate the rule against expert opinion on questions of law. The common law did not allow an expert witness to inform the jury of his or her factual conclusion concerning the 'ultimate issue' in the case, because this was thought to invade the province of the jury. The abolition in Rule 704(a) of

---

[2]"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." (Fed. Rules Evid., rule 702, 28 U.S.C.A.)

[3]"[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." (Fed. Rules Evid., rule 704, 28 U.S.C.A.)

this 'ultimate issue' rule allows the expert witness to offer his or her factual conclusion in order to aid the jury, which properly can choose to accept or reject it. However, questions of law are not 'to be decided by the trier of fact'; rather it is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable in the case and to decide any purely legal issue." (*Nieves-Villanueva* v. *Soto-Rivera, supra,* 133 F.3d at p. 100.)

The federal courts recognize the potential for prejudice when an expert opines on an issue of law is especially acute because the purported expert is a lawyer.

"There is a significant difference between an attorney who states his belief of what law should govern the case and any other expert witness. While other experts may aid a jury by rendering opinions on ultimate issues, our system reserves to the trial judge the role of adjudicating the law for the benefit of the jury. . . .

"First, . . . the jury may believe the attorney-witness, who is presented to them imbued with all the mystique inherent in the title 'expert,' is more knowledgeable than the judge in a given area of the law. [Citation.] . . . Thus, there is a substantial danger the jury simply adopted the expert's conclusions rather than making its own decision. Notwithstanding any subsequent disclaimers by the witness that the court's instructions would govern, a practical and experienced view of the trial world strongly suggests the jury's deliberation was unduly prejudiced by the expert's testimony.

"Second, testimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process. If one side is allowed the right to call an attorney to define and apply the law, one can reasonably expect the other side to do the same. Given the proclivity of our brothers and sisters at the bar, it can be expected that both legal experts will differ over the principles applicable to the case. The potential is great that jurors will be confused by these differing opinions, and that confusion may be compounded by different instructions given by the court [.] [Citations.]" (*Specht* v. *Jensen* (10th Cir. 1988) 853 F.2d 805, 808-809, fn. omitted.)

■ Even if an expert's opinion does not go to a question of law, it is not admissible if it invades the province of the jury to decide a case. "Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided or as to the amount of unliquidated damages which should be given. It is believed all courts would exclude such extreme expressions. There is no necessity for this kind of evidence; to receive it would tend to suggest that

the judge and jury may shift responsibility for decision to the witnesses; and in any event it is wholly without value to the trier of fact in reaching a decision." (1 McCormick on Evidence (4th ed. 1992) § 12, p. 47, fn. omitted.) Notwithstanding Evidence Code section 805, an "expert must not usurp the function of the jury . . . ." (*People* v. *Humphrey* (1996) 13 Cal.4th 1073, 1099 [56 Cal.Rptr.2d 142, 921 P.2d 1]; accord, *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 567 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Expert opinions which invade the province of the jury are not excluded because they embrace an ultimate issue, but because they are not helpful (or perhaps too helpful). "[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. 'Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' [Citation.]" (*People* v. *Torres* (1995) 33 Cal.App.4th 37, 47 [39 Cal.Rptr.2d 103]; see 1 McCormick on Evidence, *supra,* § 12, p. 49, fn. 11 ["The fact that an opinion or inference is not objectionable because it embraces an ultimate issue does not mean, however, that all opinions embracing the ultimate issue are admissible. . . . Thus, an opinion that plaintiff should win is rejected as not helpful."].) In other words, when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not *aid* the jurors, it *supplants* them.

This problem is illustrated in *Marx & Co., Inc.* v. *Diners' Club, Inc., supra,* 550 F.2d 505. The plaintiffs in *Marx & Co., Inc.,* brought suit claiming the defendant engaged in securities fraud and breached its contractual obligation to register stock received by plaintiffs. A primary issue at trial was whether the defendant breached its contractual obligation to use its best efforts to register the plaintiffs' stock. (*Id.* at p. 506.) The district court permitted the plaintiffs' expert, an attorney, to voice his opinion with respect to the legal obligations of the parties under the contract. (*Id.* at p. 508.)

On appeal, the Second Circuit held the trial court erred on two counts. First, it found the expert was erroneously allowed to testify on the applicable principles of law. (*Marx & Co., Inc.* v. *Diners' Club, Inc., supra,* 550 F.2d at pp. 509-510.) The court also noted the lawyer-witness was improperly allowed to testify concerning his "conclusions as to the legal significance of various facts adduced at trial." (*Id.* at p. 510.) He opined there were "no *legal* excuses" for nonperformance by the defendant based on his review of the documents and correspondence which were before the judge and jury. (*Ibid.*) The court found this was error: "[S]uch testimony 'amounts to no more than

an expression of the [witness's] general belief as to how the case should be decided.' [Citation.] The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. [Citation.] It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum. [Citation.]" (*Ibid.*)

### 3. *Admissibility of Anderson's opinions*

 Any analysis of this issue must begin with recognition that the trial court was incorrect when it concluded Anderson's opinion on whether Gilbert had a nondelegable duty was an issue of fact. It is undisputable that "[t]he question of duty is . . . a legal question to be determined by the court. [Citations.]" (*Staten* v. *Superior Court* (1996) 45 Cal.App.4th 1628, 1635 [53 Cal.Rptr.2d 657]; see *Owens* v. *Kings Supermarket* (1988) 198 Cal.App.3d 379, 385 [243 Cal.Rptr. 627] ["The issue whether a duty exists is a question of law to be determined by the court, and is reviewable de novo."]; cf. *Stanley* v. *Richmond* (1995) 35 Cal.App.4th 1070, 1087 [41 Cal.Rptr.2d 768] [whether an attorney has breached a fiduciary duty to a client is generally a question of fact]; *Wilkinson* v. *Rives* (1981) 116 Cal.App.3d 641, 647 [172 Cal.Rptr. 254] [expert testimony by a lawyer admissible in legal malpractice action to establish the applicable standard of care].) Plaintiffs do not even attempt to dispute this point. Rather, they argue admission of Anderson's testimony was not prejudicial error on two grounds: 1) Gilbert waived any error "by failing to make timely specific objection to Anderson's testimony"; and 2) any error in admitting Anderson's opinion was harmless since the court instructed the jury Gilbert was subject to a nondelegable duty and his opinion "did not affect any other issue submitted to the jury." Because it determines whether any further analysis is required, we first consider plaintiffs' claim that Gilbert waived any error in admitting Anderson's testimony.

 Based on the record, plaintiffs' claim of waiver is specious. A motion *in limine* to exclude evidence is normally sufficient to preserve an issue for review without the necessity for defendant to renew an objection at the time the evidence was offered. (*People* v. *Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People* v. *Stansbury* (1995) 9 Cal.4th 824 [38 Cal.Rptr.2d 394, 889 P.2d 588].) However, if the evidence presented during trial is substantially different from that presented at the hearing on the motion *in limine* or included in an offer of proof, it is incumbent on the party who made the motion to renew the objection to the evidence. (*People* v. *Champion* (1995) 9 Cal.4th 879, 925 [39 Cal.Rptr.2d 547, 891 P.2d 93] [when there are variations between an offer of proof and the evidence adduced at trial, defendant must bring them

to the attention of the court]; *People* v. *Morris, supra,* 53 Cal.3d at p. 190 ["Events in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353."].)

As previously mentioned, Gilbert filed a motion *in limine* to exclude any opinion by Anderson relating to an issue of law. Plaintiffs claim Gilbert's motion was overly broad because it referred to "any and all" testimony by Anderson. However, it is apparent the motion was specifically targeted at what Gilbert perceived as the primary thrust of Anderson's proposed testimony, a perception which proved to be entirely correct. However, Gilbert did not stop there. During the course of Anderson's testimony, Gilbert objected no less than eight times on the ground it involved an impermissible subject for an expert opinion. Three of these included requests by Gilbert that its objection be treated as continuing in nature. Given this record, we have no trouble finding Gilbert preserved its objection to Anderson's testimony.

In addition to his opinion that Gilbert had a nondelegable duty, the portions of Anderson's testimony which included opinions on issues of law are almost too numerous to list. They included opinions that: Cotton was hauling illegally; Gilbert's contracts with Cotton were illegal; Gilbert was legally required to be registered as a contract carrier rather than as a private carrier; and Gilbert was *liable* for the acts of Cotton under the doctrine of nondelegable duty, respondeat superior and negligent hiring of an incompetent contractor. Consistent with the overwhelming majority of precedent, Anderson's opinions on these issues were inadmissible because they usurped the responsibility of the court to instruct the jury on the applicable law.

Further, Anderson's opinion that Gilbert was *liable* for Cotton's conduct was not admissible because it went beyond merely addressing an ultimate issue. Anderson's "expert opinion" was nothing more than an attempt to direct the jury to the ultimate conclusion they should reach—Gilbert must be held liable for damages suffered by plaintiffs as the result of decedent's death. This opinion is not helpful; it is an attempt by the witness to usurp the role of the jury in weighing the evidence and drawing the appropriate conclusions. Reading Anderson's testimony in its entirety, we conclude that he was *advocating*, not *testifying*. In essence, cloaked with the impressive mantle of "expert," Anderson made plaintiffs' closing argument from the witness stand. This is a misuse of expert witnesses, and renders his testimony inadmissible under Evidence Code section 801.

### 4. *Prejudicial effect of Anderson's testimony*

Having determined the court erred in permitting Anderson to testify on issues of law as well as to his opinion on how the case should ultimately

be resolved, the question remains whether Gilbert was prejudiced by the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Since the jury found Gilbert liable on the basis it had a nondelegable duty and because it had negligently hired an incompetent contractor, it is necessary to consider the prejudicial effect on each theory of liability.

Plaintiffs argue any error in admitting Anderson's opinion on nondelegable duty was obviated when the court determined the doctrine of nondelegable duty could apply to private carriers and submitted to the jury the issue of whether Cotton's activity posed an unreasonable risk of harm to others.[4] However, the court's instructions on nondelegable duty fell far short of Anderson's opinions on the subject.

The court instructed the jury:

"You've heard some mention of private carriers, common carriers, contract carriers, nondelegable duty. Those are matters the Court had to rule on as a matter of law.

"I've ruled as a matter of law that Gilbert is a private carrier. And I've also ruled that the rules about theories of liability dealing with nondelegable duty *can* apply to a private carrier." (Italics added.) The only other instruction which the court gave concerning Gilbert's nondelegable duty was the instruction provided by plaintiff:

"An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity."

The court did not instruct the jury that even though Gilbert was a private carrier it should be considered to be operating under a franchise granted by public authority. Neither did the court explain how its instruction that private carriers *could* be held liable based on the existence of a nondelegable duty related to its instruction that holders of public franchises *were* liable based on a nondelegable duty. The only legal and logical connection between the

---

[4]Plaintiffs also argue the prejudicial impact of Anderson's testimony was minimized because the court limited him to stating what he *believed* California law to be and reserved for itself the duty of instructing the jury on what the law actually was. This is a distinction without a difference. By its very nature, expert opinions encompass what the expert *believes*. Plaintiffs' argument is meritless.

two was Anderson's opinion on the subject.[5] Thus, the appearance the court abdicated its responsibility to instruct the jury on the law to the expert could not have not been stronger.

Moreover, Anderson's repeated references to the illegality of the contracts between Cotton and Gilbert, the illegality of Gilbert hauling products while registered as a private carrier, and Gilbert's liability under the doctrine of nondelegable duty, created a real danger the jury was unduly swayed by his exhortations. Anderson not only attempted to fill the void left by the court when it failed to fully instruct on the applicable law, but also attempted to dictate the ultimate outcome of the case. We conclude, therefore, Anderson's pervasive testimony on the issue of nondelegable duty was prejudicial.

■ The question remains, however, whether Anderson's opinion concerning Gilbert's liability under the theory it negligently hired and retained an incompetent contractor was also prejudicial. In resolving this issue, we first address plaintiffs' contention that Anderson's testimony bore only on the issue of Gilbert's nondelegable duty and did not go to Gilbert's liability under the theory that it was negligent in hiring an incompetent contractor. This argument denies reality.

Notwithstanding the court's admonition that Anderson would not be allowed to testify as an expert on the negligent hiring of an incompetent contractor, he did just that. Further, on redirect examination, plaintiffs' counsel asked Anderson's opinion on whether Gilbert was liable based on a

---

[5] When a court finds that a defendant has a nondelegable duty as a matter of law, the instruction given by the court should specifically inform the jurors of that fact and not leave them to speculate on the subject. This is evident from the instruction on nondelegable duty pertaining to a nondelegable duty imposed by statute contained in BAJI No. 13.22:

"A defendant who by [statute][ordinance][safety order], such as _____, just read to you, is under a duty to provide specified safeguards or precautions or to maintain certain equipment in a specified condition, is liable for harm caused to others by the omission of a contractor employed by such defendant to provide such safeguards or precautions or by the failure of such contractor to put such equipment in the condition so required.

"Thus, if you find that the contractor employed by the defendant omitted to provide the specified safeguards or precautions or failed to put defendant's equipment in the condition required and that such omission or failure was a cause of plaintiff's injury, you will find that defendant is liable for plaintiff's injury unless defendant proves by a preponderance of the evidence that such omission or failure was not due to any negligence on the part of such contractor." (See also, *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 405-406 [185 Cal.Rptr. 654, 650 P.2d 1171] [" 'The manufacturer of a completed product cannot delegate to anyone its duty to have its product delivered to the ultimate user free from dangerous defects.' "]; *Jordy* v. *County of Humboldt* (1992) 11 Cal.App.4th 735, 741, fn. 5 [14 Cal.Rptr.2d 553] [" 'The County is not a [*sic*] insurer of the child's safety, but it does have the duty to attempt to provide normal care for a child placed in shelter care. The duty to provide such care as would be provided by the normal family cannot be delegated to others.' "]; *LaCount* v. *Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d-754, 772 [145 Cal.Rptr. 244].)

nondelegable duty *and* whether Gilbert was liable based on the negligent hiring of an incompetent contractor. Therefore, plaintiffs' argument that Anderson's testimony did not reach the latter issue is frivolous.

In order for plaintiffs to recover from Gilbert on the basis that it was negligent in hiring and retaining an incompetent contractor, they were required to prove, among other things, that Cotton was incompetent with respect to the operation of its trucking company. It also had to prove that Gilbert failed to exercise reasonable care in hiring and retaining Cotton. There was more than ample evidence to support the conclusion that Cotton was incompetent in the operation of its trucking company without reference to Anderson's testimony.

At the time of the accident, Cotton was not in compliance with several of the safety programs mandated as a condition to being allowed to operate trucks on highways in California. Moreover, the person responsible for maintenance of Cotton's trucks, Marvin Cotton, did not even know these programs existed. Cotton had been cited on numerous occasions for having deficient brakes on its trucks prior to the date of the accident, and only half of the brakes on the truck that struck decedent were operable. Piggee testified that on one occasion "misadjusted" brakes on a Cotton truck he was driving caused him to spin 360 degrees when he attempted to avoid hitting a car that pulled in front of him. Both Keller and Piggee testified the trailers used by Cotton were cracked, with popped rivets, so that corn would leak from them. In light of this evidence, we conclude that even if Anderson's testimony was excluded, there is no reasonable probability the jury would have found Cotton was competent to perform the job for which it was hired. However, the question of whether the jury would have found Gilbert did not exercise reasonable care in hiring and retaining Cotton absent Anderson's testimony is not so easily answered.

All the employees and principals from Gilbert disavowed any actual knowledge of maintenance deficiencies or safety problems with Cotton's trucks. All the employees and officers of Cotton testified they never told anyone at Gilbert about any maintenance problems they were having or asked Gilbert's assistance in correcting any problems they had with their trucks. The only testimony tending to contradict this evidence was Piggee's statement that he recalled an employee identified only as "Jerry" at one of Gilbert's facilities other than Berry Seed and Feed Company, referring to Cotton's trucks as "junk." Thus, the question of whether Gilbert was negligent in hiring and retaining Cotton turned on the extent of Gilbert's duty to inquire about Cotton's safety and maintenance history, and what information Gilbert could have learned had it exercised reasonable care in making inquiries.

Plaintiffs attempted to establish that Gilbert could have learned of Cotton's incompetence in the exercise of reasonable diligence in two ways. First, they attempted to establish that Gilbert had a firsthand opportunity to assess Cotton's maintenance and safety problems based on the apparent deficiencies in the trucks Cotton used. To this end, plaintiffs highlighted the number of times Cotton trucks hauled loads to Berry Seed and Feed Company in the months preceding the accident. They also presented evidence of the obvious problems with the truck driven by Comacho on the morning of the accident, i.e., duct tape on the brake line. Additionally, plaintiffs presented evidence through Piggee that on more than one occasion, Cotton's trucks had broken down while at Berry Seed and Feed Company and on one occasion the truck he was driving had to be towed by another Cotton truck driven by Marvin Cotton.

Second, plaintiffs attempted to establish it was standard practice in the industry to make inquiries concerning the safety record of a contractor before it is hired to haul goods. To this end, plaintiffs called William Praetz, a retired California Highway Patrolman who ran a consulting firm, to testify concerning the custom and practice in the *trucking industry* when hiring a subhauler. Praetz testified it was the custom and practice in the industry "for a motor carrier to investigate the safety program and the operational criteria . . ." of any subhauler it utilized. Praetz testified Gilbert should have requested a copy of Cotton's MISTER Report, and should have required Cotton to designate Gilbert as a third party on the pull notice program. This would have resulted in Gilbert receiving notice of the driving record of Cotton's drivers. Praetz opined that Gilbert's level of inquiry into Cotton's safety record was not acceptable, and that within the custom and practice of the industry, Gilbert should have known Cotton was an incompetent contractor.

Plaintiffs' evidence of Gilbert's failure to exercise reasonable care in hiring and retaining Cotton did not go unrebutted. In contrast to Piggee's testimony, Marvin Cotton and Keller testified they never broke down while at Berry Seed and Feed Company. Additionally, Keller testified he never had any problems with the brakes on any of Cotton's trucks, including the one driven by Comacho on the day of the accident. Keller testified the hole in the air line for the brakes only happened on the morning of the accident and he placed the duct tape over it as a temporary repair. As stated above, no employee or officer of Gilbert testified they observed any defect in Cotton's trucks, did not experience any unreliability while using Cotton to haul its products, and were unaware of any safety violations or problems Cotton was suffering. Finally, both Maurice and Marvin Cotton testified that if anyone asked, they would have said Cotton was properly licensed to carry agricultural goods and complied with all safety and maintenance programs prescribed by the state.

During cross-examination Praetz admitted that even if Gilbert had requested a MISTER report on Cotton, it would not have revealed Cotton's violations prior to 1993 because the report did not exist since Cotton was not participating in the BIT program in 1993. Praetz conceded that prior to March 12, 1993, the PUC did not require proof that a carrier was participating in the BIT program. He also conceded the Vehicle Code does not require an entity such as Gilbert to check a carrier's PUC status, request a MISTER report, obtain copies of the carrier's pull notice program, or ensure the carrier participates in the BIT program, before retaining it.

Gilbert also called Ned Nuerge, as an expert on the industry standard for hiring independent carriers. Based on his experience as the owner of his own trucking firm from 1990 to 1993, Nuerge testified that in March 1993, the standard practice for a shipper hiring an independent carrier was to interview the carrier and verify it had the proper permits. Nuerge testified a shipper would normally only verify that the carrier had the proper permits when it was initially hired—not on a recurring basis. He stated it was not the standard practice in the industry to verify a carrier's permits on an annual basis, check the Department of Motor Vehicles records of the carrier's drivers, order a MISTER Report, or check the carrier's maintenance report. Nuerge explained the term "subhauling" pertains to the situation where one trucking company agrees to haul freight for another trucking company. Nuerge opined that based on his experience, Gilbert was a milling company—not a trucking company. He based his conclusion on the fact that Gilbert operated its trucks as a service to its customers.

Thus, absent Anderson's opinions on the theory of negligent hiring, the evidence of Gilbert's liability on this theory was far from overwhelming. In reality, it presented a very close question of fact. We conclude Anderson's inadmissible opinions on Gilbert's liability and the legality of Gilbert's actions was so pervasive that it infected the entire proceeding. Given the nature of the conflicting evidence on whether Gilbert exercised reasonable care in hiring and retaining Cotton, we cannot say it was unlikely the admission of Anderson's opinion on the subject did not affect the verdict. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.) We find, therefore, that the erroneous introduction of this evidence on the issue of negligent hiring and retention constituted prejudicial error as well.

II., III.*

* * * * * * * * * * * * * * * * * * * * * * * * *

* See footnote, *ante,* page 1155.

## Disposition

The judgment is reversed. Costs are awarded to Gilbert.

Dibiaso, Acting P. J., and Buckley, J., concurred.

A petition for a rehearing was denied March 3, 1999, and respondents' petition for review by the Supreme Court was denied April 28, 1999.