Filed 2/29/24  Oshodin v. Fire Insurance Exchange CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROBERT OSHODIN et al., | B319043 consolidated with B322806 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC623155) |
| v. | |
| FIRE INSURANCE EXCHANGE, | |
| Defendant and Respondent. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Law Offices of Alvin L. Pittman and Alvin L. Pittman; Law Office of Christie E. Webb and Christie E. Webb for Plaintiffs and Appellants.

Tharpe & Howell, Christopher S. Maile; Greines, Martin, Stein & Richland, Edward L. Xanders, Rachel A. Beyda for Defendant and Respondent.

Plaintiff and appellant Robert Oshodin (Oshodin) asked Okason Okey, an agent of defendant and respondent Fire Insurance Exchange (Fire), to sell him a homeowner's insurance policy that covered "everything in the house, fully and completely." Okey said he would, and Oshodin purchased the policy Okey prepared without reviewing it. The home Oshodin shared with his wife, plaintiff and appellant Mimi Oshodin, was later burglarized; two safes containing jewelry Oshodin testified was worth millions of dollars were among the items stolen. The Oshodins made a claim of loss to Fire, which issued a policy-limit payment of $5,000 for the jewelry.

The Oshodins sued Fire, asserting in their operative second amended complaint claims of negligence, negligent misrepresentation, breach of oral contract, and breach of the implied covenant of good faith and fair dealing. The trial court sustained Fire's demurrer to the breach claims without leave to amend. The negligence and negligent misrepresentation claims went to jury trial after the Oshodins rejected Fire's Code of Civil Procedure section 998 settlement offer of $25,000. By special verdict, the jury found that Fire, through Okey, was not negligent by failing to obtain the insurance Oshodin requested and did not make a false representation of fact to Oshodin. The trial court subsequently awarded Fire $484,834.16 in costs. The Oshodins appealed from both the judgment and the cost award; we consolidated the appeals for all purposes.

The Oshodins contend the trial court made several errors. First, they argue the court erred by denying their motion to exclude testimony by Fire's experts, whom the Oshodins contend gave impermissible and argumentative testimony about legal duties. Second, they argue the court erred by refusing their

2

requests to modify CACI No. 2361, the pattern jury instruction on negligent failure to obtain insurance coverage, and to deliver special instructions on negligence and reliance.  Third, the Oshodins argue the court erred in sustaining Fire's demurrer to their breach causes of action without leave to amend. Finally, they argue the court abused its discretion by finding Fire's Code of Civil Procedure section 998 offer of $25,000 reasonable, and improperly ordered them to pay expert fees Fire incurred after making the offer.  They alternatively assert that even if the settlement offer was reasonable, certain expert testimony was not reasonably necessary to the litigation and therefore should have been taxed from Fire's costs.  We affirm the judgment and costs order.

## FACTUAL BACKGROUND

Oshodin testified that he was retired from a lengthy career in furniture manufacturing.  Although he was not formally educated, and was largely unable to read English, Oshodin started his own successful furniture manufacturing company in 1962.  By the late 1960s, he began traveling the world from his native Nigeria.  Oshodin gave much of the jewelry to Mimi[1] as gifts, though he also had his own sizable collection of watches and other items.

In 1982, Oshodin began purchasing real estate in the United States.  He first learned about homeowner's insurance at

---

[1]     We refer to Mimi by her given name to distinguish her from her husband Robert and avoid confusion.  No disrespect is intended.

3

that time.[2]  During Oshodin's subsequent purchase of a home in Marina Del Rey, his friend introduced him to Farmers Insurance, a service mark under which Fire and its affiliates market and sell insurance that the friend described as "the best."  Oshodin insured the Marina Del Rey home through Farmers.

Okey testified that he began working for Farmers in 2006 and became Oshodin's insurance agent in 2009 or 2010.  Okey learned that Oshodin could not read English at some point prior to the events at issue here.  Both Okey and Oshodin testified that Okey wrote premium checks that Oshodin signed.

In or about 2012, Oshodin purchased a home on Kenway Avenue.  He insured the home through Farmers.  While Oshodin was living there, the home sustained $400,000 worth of water damage.  Oshodin filed a claim with Farmers, but the claim was denied.  Oshodin decided to remain with Farmers despite being upset about the claim denial because he had a long relationship with Farmers and did not want to look for a new insurance provider.

In 2014, Oshodin purchased a $9.5 million home on South Lorraine Boulevard.  Before escrow closed, he called Okey to obtain insurance for the home.  Oshodin testified that Okey came to the house but said he could not insure it yet because it was not fully furnished; Okey testified that he went to the house but could not insure it because escrow had not closed.  The parties agree that  Okey later returned to the home and Oshodin repeatedly told Okey that he wanted "everything" in the house "completely and fully insured."  They also agree that Okey

---

[2]  Oshodin explained that "in Nigeria, you don't insure" and instead "pay the government" to ensure that "police men secure your house."

4

responded "yes" or "okay," and that Oshodin walked Okey through the entire home.

What happened during the walkthrough was disputed. Oshodin testified that he showed Okey "everything" in the house, including valuable items such as a 5,000-bottle wine collection, "over 30 crystal chandeliers," "a lot of paintings," $1.1 million draperies, and a "very beautiful door . . . from Wolfgang Amadeus Mozart." Oshodin further testified that he showed Okey a safe containing his substantial jewelry collection. Oshodin testified that he opened the safe, which he described as "big," about three feet tall and "maybe 300 pounds."[3] Okey looked inside the safe but did not ask Oshodin any questions about its contents, which according to Oshodin included "about 27 wrist watches" ranging in price from about $30,000 or $40,000 to $2.6 million; "like 12" rings, one of which Oshodin paid $950,000 for; "more than ten" diamond bracelets; a $45,000, 18-karat gold Vertu phone; and "a lot of documents," including "the appraisal of the whole jewelry."

A similar safe containing Mimi's jewelry was also in the home at the time, but the parties agreed that Oshodin did not

---

[3]     Fire witness Michael Larsen, a gemologist, testified that he went to a security store and measured the exact model of safes Oshodin owned. According to Larsen, the safes were 20 inches tall and 17 inches wide, with interior dimensions of "like 12 inches by 12 inches by 15 inches." Larsen built a replica safe using those dimensions. The replica was shown to the jury as a demonstrative, and photographs of the replica were admitted into evidence. Another Fire witness, Amy Brasseur, testified that she reviewed the specifications for the safes based on the model numbers listed on receipts Oshodin provided. Those specifications indicated that each "safe was about 20 inches, so less than 2 feet tall, small inside. It weighed about 165 pounds and had one tray in it."

open it.  Oshodin testified that Mimi's safe contained ladies' versions of the watches he owned, in addition to "rings, very expensive ones," and "unlimited" bracelets, necklaces, and earrings.  There was conflicting evidence regarding how much jewelry was in Mimi's safe during the walkthrough.  Mimi was unavailable for trial but testified, via deposition excerpts read to the jury, that her safe contained at least 86 pieces of jewelry when it was stolen.  Larsen opined that "it does not seem like there is any way that you can fit all of those items" in the safe.

During his deposition, Okey testified that Oshodin showed him a "sizable" safe during the walkthrough.  Okey also testified during his deposition that Oshodin opened the safe, and he saw "[a] bunch of jewelry.  And you know, . . . different kinds, gold.  I guess . . . some of them, you know, colors like this.  Some – some like this color, but mainly gold, you know, kind of bling bling stuff in there and that was so."

On the stand during trial, however, Okey disavowed his deposition testimony, explaining that he was "not in my clear mind" during the deposition due to stress and depression from a marital separation.  At trial, where he said his mental health was "a lot more clearer [*sic*]" and he knew "what I'm saying is true," Okey testified he did not see a safe.  He also said that he saw "something there that I thought may have been a safe," but he "wasn't sure now."  The defense additionally introduced a recorded statement Okey made prior to his deposition, in which he said he did not see any safe or the contents thereof during the walkthrough.

Okey admitted at trial that he saw "a few cases" of wine, and some artwork, but stated that Oshodin did not provide and he did not request an inventory of those items or any other

personal property in the home, including the jewelry. Oshodin also testified that he did not specifically ask or tell Okey to insure the jewelry or any other items of personal property; he "just told him he should insure everything in my house fully. Everything. Everything." Had he known that the jewelry would not be fully covered under the policy, Oshodin would have hidden it throughout his house and hired armed guards to protect the house "24/7."

The parties agreed that when the walkthrough was complete, Okey entered information into Fire's computer system and printed out a policy proposal or insurance quote. They disputed what happened next. Oshodin testified that Okey presented him with papers and told him where to sign without reviewing the contents with him or reading anything to him. During his deposition, Okey said that after he learned Oshodin could not read, Okey did not "bother" to review paperwork with him and would "just tell [Oshodin] okay. . . . [Oshodin says] Okason, are you sure that this covers me completely because I don't . . . want what happened on . . . Kenway to happen in Lorraine, and I tell him yes. And he says okay, and he says okay. And then he went ahead and signed." Okey also said during his deposition, "I should have brought it up to him when we were getting the initial quote, that I should have told that, you know, that the jewelry or the jewelries they have is not - - is not covered or it has very limited coverage under the current policy." Indeed, he stated, "I made a mistake."[4]

---

[4] Specifically, he said that he told Oshodin, "I made a mistake" after Fire determined that the full claimed loss of the jewelry would not be covered. Okey was initially included as a

7

At trial, Okey testified that he did "not even remember how" the deposition testimony happened. He stated that he always reviewed insurance quotes with Oshodin and did so with regard to the Lorraine property. Okey further testified that he "remember[ed] mentioning both the jewelry and earthquake" policy limits to Oshodin. Okey said that when he told Oshodin jewelry was not included in the policy, Oshodin responded, "well, he has cameras and alarm system [*sic*] in the house." Regarding his "mistake," Okey testified, "I think I may have said that, but I really – I really didn't make a mistake." As addressed more fully in the Discussion section below, Fire called several expert witnesses who concurred in this assessment and opined that Okey met the requisite standard of care.

Ultimately, Oshodin signed the proposal, which contained a coverage limit of $2,090,250 for personal property and did not include any policy endorsements. He did not read it and did not ask Okey or anyone else to read it to him. Oshodin also signed an accompanying "California Residential Property Insurance Disclosure" form that stated, "[a]lmost all policies include specific dollar limitations on certain property that is particularly valuable, such as jewelry, art, or silverware. Contact your agent, broker or insurance company if you have any questions about your contents coverage." Oshodin paid the quoted premium of $10,115.15 by check. He did not contact Okey with questions.

_____

defendant in this action but was dismissed from the case with prejudice after he settled with the Oshodins for $1 million under his errors and omissions policy. The jury heard the "mistake" testimony (and argument related thereto) but was not told about the settlement.

A few weeks later, an insurance policy dated August 15, 2014 was sent to Oshodin at the Lorraine address. The declarations page of the policy stated that the coverage limit for personal property was $2,090,250. Page 12 of the policy stated that "[s]pecial limits of coverage apply to certain types of personal property." "Jewelry, watches, precious and semi-precious stones, and furs" were explicitly listed as property subject to coverage limitations. The coverage was limited as follows: "$1,000 limit on any one article and $5,000 total limit on theft of jewelry, watches, precious and semi-precious stones and furs. . . . This applies even if such items are considered artwork or used as decoration." Oshodin testified that he did not read or have anyone read to him the policy or any notices Farmers sent. Indeed, he denied receiving the policy or other notices in the mail and stated that he asked Okey to hold his mailings so he would not receive mail from Farmers.[5] However, Oshodin admitted to receiving and cashing two refund checks Farmers sent him around the same time.

It is undisputed that Oshodin renewed the insurance policy the following year. The renewed policy contained the same coverage limitations.

---

[5] Okey testified that he initiated a "hold mail" or "stop mail" in Farmers' system at Oshodin's request sometime after Oshodin moved to the Lorraine home. Okey said he did not know whether certain types of mailings, including refund checks, could actually be stopped. Donald Fare, Fire's Director of Postal Compliance, testified that Fire's "documentation trails" showed that the policy, policy renewal, and other related documents addressed to Oshodin were picked up for processing by its mail vendor in the normal course of business.

On November 22, 2015, while the renewed policy was in effect and the Oshodins were out of the country, thieves burglarized the Lorraine home. The two safes, which Oshodin testified collectively contained approximately $50 million worth of jewelry in addition to documents, luxury car keys, a pen set, and expensive phones, were among the items stolen. Oshodin testified that police called him, notified him of the robbery, and asked his permission to enter the home to investigate. The police also said they had been told the safes contained about $100 million worth of jewelry, but Oshodin told them it was "about $50 million" because his "upbringing" was to avoid "dishonesty." The police asked Oshodin to provide them with receipts or pictures of the jewelry. Oshodin told them that most of the receipts and appraisals were in the safes with the jewelry but began gathering photographs of himself and Mimi wearing various pieces. The Oshodins compiled a list of items they believed were taken, though they noted the list was likely incomplete.

In January 2016, the Oshodins submitted a claim of loss to Farmers. The document exceeded 200 pages and included "(1) the Preliminary 'Proof of Loss, with Declaration'; (2) a preliminary list of identified items stolen, together with their values; (3) receipts for some of the items identified; and (4) some photographs depicting some of the items know [*sic*] to have been stolen from the insured home." It also included a disclaimer that the Oshodins were "experiencing mental and emotional trauma and depression associated with this shocking intrusion and theft of valuable personal property" and thus "neither claim, nor believe, that the items listed . . . is a complete statement of items taken." The document was admitted into evidence amid lengthy testimony about its contents.

Farmers claims adjuster Amy Brasseur handled the $7.2 million claim. She testified to numerous problems with the document, including duplicative claims, numerical discrepancies, unusual dates, failure to account for currency exchange rates, and a lack of corroborating receipts, appraisals, and purchase details. Notwithstanding these issues,[6] some of which Oshodin characterized as calculation mistakes by the person who prepared the document, Farmers paid the Oshodins the policy sub-limit of $5,000 for the jewelry losses. Brasseur testified that she did not "even price out all of the jewelry" before paying the claim, because given the quantity and "high-end names" claimed, "it's reasonable to assume that you're going to hit that $5,000 limit" and "it doesn't make sense to spend the time and effort to price out each item when the end value isn't going to change." Brasseur acknowledged on cross-examination that Farmers could deny claims in their entirety if it determined that the insured made material misrepresentations, and no such denial was made in this case. In total, Farmers paid the Oshodins $113,695.48.

## PROCEDURAL HISTORY

The Oshodins filed suit against Okey, Fire, and various related corporate entities[7] in June 2016. After two rounds of demurrers and roughly contemporaneously with Okey's dismissal, the Oshodins filed their operative second amended

---

[6] The Oshodins' counsel acknowledged the document was "a train wreck" during closing argument.

[7] The corporate defendants included Farmers Group, Inc., Farmers Insurance Group, Inc., and Farmers Insurance Company, Inc. The trial court granted summary judgment in their favor on the second amended complaint in October 2017; neither those defendants nor the ruling dismissing them is at issue here.

11

complaint against Fire on April 18, 2017.  They asserted four causes of action: negligence, negligent misrepresentation, breach of oral contract, and breach of the implied covenant of good faith and fair dealing.

As discussed more fully below, the trial court sustained Fire's demurrer to the two breach counts without leave to amend. Fire subsequently moved for summary judgment on the remaining causes of action for negligence and negligent misrepresentation.  The trial court denied the motion.  Shortly thereafter, Fire offered to settle the matter for $25,000 pursuant to Code of Civil Procedure section 998, with each party to bear its own costs.  The Oshodins rejected the offer, and the matter proceeded to jury trial.

Prior to trial, the Oshodins filed a motion in limine "to preclude lay and expert testimony on insurance industry factors as irrelevant and prejudicial and lacking foundation."  The trial court denied the motion.  As discussed more fully below, Fire called three experts at trial to testify about typical practices and standards of care in the insurance industry.

Toward the end of the 15-day trial, the parties and the court had several discussions about jury instructions and verdict forms.  As discussed more fully below, the trial court denied the Oshodins' request to modify CACI No. 2361, the pattern jury instruction on negligent failure to obtain insurance coverage.  It also denied their request for special instructions on negligence and reliance.  The parties agreed on a special verdict form, and the jury used the form to find, 10-2, that Fire, through Okey, was not negligent by failing to obtain the insurance Oshodin requested and did not make a false representation of fact to Oshodin.

12

After trial, Fire filed a memorandum of costs seeking a total of $668,817.60. The Oshodins responded with a motion to tax costs. After hearing the matter, the trial court granted the Oshodins' motion to tax costs in part and taxed Fire's costs in the amount of $183,983.44, awarding it $484,834.16.

## DISCUSSION

### I. Expert Testimony

The Oshodins first contend the trial court erred by denying their motion in limine to exclude expert and lay testimony on "insurance industry factors." They argue that expert testimony was irrelevant to the issues of negligence and negligent misrepresentation and therefore "served to mislead and confuse" the jury. They further argue that three of Fire's witnesses, Peter Marchel, Van Hedges, and James Michael Pickens impermissibly testified about Okey and Oshodin's legal duties and engaged in legal argument. They assert that the admission of this testimony was prejudicial because it "changed the burdens of proof and turned this case from a 'failure to provide the agreed upon coverage' case to order taking standard case." We find no error.

#### A. Background

##### 1. Motion in Limine

Prior to trial, the Oshodins moved to "preclude lay and expert testimony on insurance factors as irrelevant and prejudicial." The Oshodins asserted that they expected Fire's experts to "testify the requested coverage was not available, about the risks of the coverage requested, the obligations and responsibilities of the insured and insurer's agent, etc." They argued such testimony was "irrelevant to Plaintiffs' simple claims for negligence and negligent misrepresentation" because "[n]one of those insurance industry factors were known to the Oshodins

13

or influenced the communications between them and Defendant's agent Okey." They asserted that the case was "based on a simple set of facts . . .[,] not specialized information outside the domain of lay consumers, and thus the expert testimony designated is totally irrelevant and impermissible and will be unduly prejudicial and confusing to the jury." In their view, the "only relevant facts are what the consumer Mr. Oshodin requested and what [Fire's] agent Okey failed to do to fulfill that request, while he then represented to the Oshodins he had obtained the insurance required to cover everything in their . . . home." The Oshodins further asserted that even if the testimony were relevant, it should be excluded under Evidence Code section 352 because it would shift the jury's focus away from the interaction between Oshodin and Okey.

Fire opposed the motion. It argued that its proffered testimony would "show the standard of care to be applied to Mr. Okey's conduct and whether he breached it; the responsibility and obligations of the Oshodins in obtaining coverage for their jewelry and whether they satisfied them; and whether the conduct of Mr. Okey was a substantial factor in causing Plaintiffs' damages, among other things." Fire further argued that expert testimony was necessary to establish the standard of care, because the case involved professional negligence. Fire also argued that the expert testimony would establish that no reasonable consumer could have expected the requested coverage under the circumstances.

In reply, the Oshodins reiterated that expert testimony was unnecessary "because it is common knowledge that an agent's failure to procure the insurance coverage requested by an insured breaches the duty of care owed to the insured." They further

14

asserted that their case was "like a res ipsa case where a professional acts negligently and the negligent act is within the common knowledge of lay persons," and that Okey's "admitted failure to obtain the coverage requested by the Oshodins constitutes negligence as a matter of law."

The court denied the motion before trial. Characterizing the motion as a "meat cleaver," the court reasoned it was "premature to say that this is off limits." The court also remarked that it would like to hear the Oshodins' evidence before limiting Fire's.

After the Oshodins completed their case-in-chief, and one of Fire's experts already had testified, the Oshodins' counsel raised the issue of whether it would be proper for Fire's experts to testify about Oshodin's reasonable expectations when interacting with Okey. The court stated, "I don't know that they can tell us how Mr. Oshodin was reasonable, how he should have acted," but "they can tell us what obligations that [*sic*] consumers have in applying for insurance." The court also said, "Yeah," after Fire's counsel remarked, "When I ask an inappropriate question, all they have to do is object for the court to rule on it, not try to put a gag order on it at this point in time."

### 2. Expert Testimony
#### a. James Michael Pickens

Pickens was the first expert Fire called, before the discussion regarding Oshodin's expectations. Pickens was a former insurance defense attorney and Arkansas insurance commissioner and current administrative law judge in Arkansas. He testified that Fire asked him to consider four questions: (1) whether any insurance company in California could legally offer the coverage Oshodin requested; (2) whether the Oshodins "did

15

everything that they were supposed to do in order to obtain insurance for this alleged jewelry collection"; (3) whether Okey "satisfied all of his duties and obligations in procuring the coverage that the plaintiff requested"; and (4) whether Okey "had an obligation or responsibility to obtain coverage for this alleged jewelry collection."

Pickens testified that it was "very important that the insurance company knows exactly what risk they're insuring," because "if they don't know what they're covering or what all the risks are, then they don't know how to price the insurance policy, and they could be charging too much or two [*sic*] little depending on the amount of risk." He further testified that if a customer says that he or she wants "everything in the house insured" but does not add, "including my jewelry," the insurance company "would have absolutely no way to know: number 1, whether or not a jewelry collection exists. If a jewelry collection does exist, what it consists of, how much the insured paid for the jewelry, what the current appraisal is of the jewelry." In such a situation, it would be "impossible . . . for the insurance company to know what they're even being asked to insure; and . . . how they can possibly price that risk."

Pickens opined that the Oshodins "absolutely did not satisfy even the minimum obligations that they had to procure the coverage for their jewelry collection." He testified that "there is something in the law, a concept in the law, called 'the duty of good faith and fair dealing'" that requires participants in a transaction to disclose all material facts, and Insurance Code section 332 imposes the duty in the context of insurance contracts. Pickens opined that Oshodin had an "affirmative duty" to disclose information about the jewelry collection to Okey, "just

16

like it's an affirmative duty on the part of the insurance company to tell me what is and isn't covered under the policy." He further opined that Oshodin's request to insure everything in the home fully and completely was "vague," "nonspecific," and "ridiculous." He added that it would be "impossible" and "illegal" under Insurance Code section 381 "for an insurance company to provide the coverage that the plaintiffs requested." Pickens further testified about "moral hazards," which he defined as "any term or condition in an insurance policy that increases the risk of fraud or increases the risk of exaggerated claims." As an example, he said an insured could falsely claim "I had $2 million worth of gold bricks . . . in a suitcase in my closet," and "the company has no way of knowing on the front end what they're being asked to insure." He added that "FBI statistics" show about $40 billion in insurance fraud each year, which translates to "each and every American family" paying an additional $400 to $700 in premiums each year, because insurance companies "pass that charge on to the consumer."

Pickens opined, based on "the fundamental principals [*sic*] of insurance regulatory law and public policy," that Okey "did everything that was possible under the circumstances and the facts of this case to procure the coverage that the plaintiffs requested." He opined that a reasonable insurance agent would understand a request for full and complete coverage of everything to mean "I want the very best policy that you have to offer," and Okey provided a "top-of-the-line policy." Pickens further opined that Okey had no obligation to provide coverage for the jewelry collection because he was not specifically told about it.

The Oshodins' counsel did not object to any of this testimony.

17

### b.    Peter Marchel

Marchel was a licensed attorney and the president of an "insurance wholesaler" or "surplus lines" broker that "specializes in placing difficult-to-place risk." Marchel explained that surplus lines insurers issue insurance policies for unusual items, such as Marilyn Monroe's legs, or against non-standard risks, such as cyber attacks. He testified that Fire asked him to "investigate, research, and develop an opinion as it relates to the insurance risk, as it relates to the placement, and as it relat[ed] to marketing and insurance industry practices in relationship to the availability of the insurance requested as well as the pricing."

Marchel opined that "one of the key principles of insurance is that you rely on the insured to tell you what insurance you want as well as how much," and that principle is incorporated into the insurance application, which "says that you have the responsibility of doing that, you've acknowledged that, and you agree with the terms and conditions that are set forth in the application." He "would anticipate that if they are unable or cannot read, they would have somebody explain that to them or read that to them, and that's common." Marchel opined that Oshodin could not have obtained a policy that "literally provided full and complete coverage for everything the Oshodins owned," because such a policy would have "unlimited terms and unlimited conditions," and "spelling out exactly what is covered . . . helps limit moral hazards." He characterized a policy without such limits as "a blank piece of paper" and reiterated, "it can't be done."

Marchel further opined that "if somebody says I want you to insure everything I own inside and outside the house, it's

18

assumed it's a homeowner's policy because the homeowner's policy covers what's inside and outside the house." "If he would have said, I have a $20 million jewelry collection I want insured, a jewelry collection worth tens of millions, the focus is no longer on the house." Marchel testified that the existence of such a collection is material to insurers because jewelry is a "high-theft item" and "they don't want to have to worry about it disappearing." "They want to insure risk, but they want to insure intelligent risk." He opined that "given all the facts that we have in this case, no. No insurance carrier would insure it."

The Oshodins' counsel did not object to any of this testimony.[8]

### c. Van Hedges

Hedges was a former adjunct professor of insurance who currently co-owned an insurance consulting business. Hedges testified that Fire asked him "to opine on what the responsibilities and obligations of an insured like Mr. Oshodin are in requesting insurance" and "to develop an opinion as to what the obligations and responsibilities of the agent were, Mr. Okey, in placing insurance, the insurance that was requested." Fire also asked him "given the insurance that was requested, what could Mr. Oshodin reasonably have expected to receive," and "if there were any exclusions or conditions within the policy that would apply in this case." Hedges testified that in preparing

---

[8] Counsel objected only when Marchel testified that "Nigeria and Ukraine and other eastern European countries are kind of a no-fly zone for insurance. In other words, there's a lot of risk. That's because of the political and economic environment. They're not going to want to write anything out of those countries." The court overruled counsel's Evidence Code section 352 objection of "[r]acially prejudicial."

his testimony, he reviewed the policy, the pleadings, and the depositions, as well as "a lot of what we call 'insurance treatises,'" including "New Appleman on Insurance Law."

Hedges opined that an insurance agent has a responsibility to "provide the coverage that was specifically requested," and a request to cover "everything in a house . . . fully and completely" is not a specific request because "[t]here is no such thing as a policy that covers everything." He further opined, "[t]he standard of care in California and in 39 other states is what's called the 'order taker standard of care,'" which "is to provide any insurance specifically requested or if he cannot provide it, to inform the insured that he cannot provide it. Period." Hedges opined that Okey complied with that standard of care because Oshodin "asked for coverage on his house and Mr. Okey provided a very broad insurance policy." He further opined that is what a consumer would have expected to receive in this case. On cross-examination, Hedges stated, "it is clear within the insurance industry, that absent a specific request, he [Okey] has no duty, no responsibility, and no obligation to provide any additional coverage. So he met the standard of care in this case."

If a customer wants to insure millions of dollars' worth of jewelry, Hedges opined, he or she would need to say "[e]xactly what it is he wants insured and how much he wants it insured for." Hedges opined that "before Mr. Okey would have an obligation under the order taker rule to tell the Oshodins that he could not get them insurance for tens of millions of dollars of jewelry," the Oshodins would have to "specifically request coverage for jewelry." Because "each piece of jewelry is of additional significance for exposure" to the insurance company in terms of risk and the premium it would require, Okey "would

20

need a great deal of additional information before he could determine whether or not he could provide" insurance for the jewelry. Hedges stated that "there is no way" for an insurance company to cover everything, and that such a request is "nonsensical."

The Oshodins' counsel did not object to any of this testimony.

**B.    Analysis**

"'A motion in limine is made to exclude evidence before the evidence is offered at trial, on grounds that would be sufficient to object to or move to strike the evidence. The purpose of a motion in limine is "to avoid the obviously futile attempt to 'unring the bell' in the event a motion to strike is granted in the proceedings before the jury."'" (*Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility District* (2007) 149 Cal.App.4th 1384, 1392.) Unless the trial court's ruling on a motion in limine has the effect of precluding an entire cause of action or defense, we review the ruling for abuse of discretion. (*Ibid.*; *Garner v. BNSF Railway Company* (2024) ---Cal.Rptr.3d---, 2024 WL 45102, at \*6.) We review rulings concerning the admission or exclusion of expert testimony the same way. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772.) The parties agree the abuse of discretion standard applies to the evidentiary issues raised here.

Expert witnesses generally are permitted to offer opinion testimony regarding any "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates." (Evid.

Code, § 801.) Additionally, "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) "However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes." (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178 (*Summers*).) For instance, it is well-established that experts are not permitted to opine on questions of law or offer legal conclusions. (*Ibid.*; see also *City of Rocklin v. Legacy Family Adventures-Rocklin, LLC* (2022) 86 Cal.App.5th 713, 728 [collecting cases].) Experts also may not overtly advocate from the stand; that is "a misuse of expert witnesses" which "renders [their] testimony inadmissible under Evidence Code section 801." (*Summers*, *supra*, 69 Cal.App.4th at p. 1185.)

The Oshodins contend that testimony from Pickens, Marchel, and Hedges violated these principles. They assert that the experts improperly opined on the legal question of duty by testifying about Oshodin's and Okey's respective obligations. They also assert that the experts offered a legal conclusion by opining that insurance coverage for "everything" is not available. They further argue that the experts engaged in improper advocacy by referring to the jewelry as an "alleged jewelry collection," using the phrase "moral hazard," using a "charged example" of "suitcases with gold bullion in the closets," stating that Nigeria was inherently risky for insurance, and calling Oshodin's request to insure "everything" "ridiculous" and "nonsensical."

As we noted above, however, the Oshodins' counsel objected to only one small slice of the experts' testimony during trial:

Marchel's assertion that Nigeria was a risky insurance market. A party who seeks to exclude expert testimony—or any evidence—is required to make a timely and specific objection to the evidence. (Evid. Code, § 353, subd. (a); *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 346 (*Heiner*).) "A timely objection allows the trial court to exercise its sound discretion with respect to admissibility of expert testimony." (*Heiner*, *supra*, 84 Cal.App.4th at p. 346.) As the Oshodins point out, a motion in limine filed before trial "is normally sufficient to preserve an issue for review without the necessity of the moving party's renewing its objection at the time the evidence is offered." (*Summers*, *supra*, 69 Cal.App.4th at pp. 1157-1158; see also *People v. Morris* (1991) 53 Cal.3d 152, 189, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830 fn. 1 ["mere repetition of the same objection advanced on the motion *in limine* would serve no useful purpose"].) However, the objections raised in the motion in limine—relevance and undue prejudice—are different in kind than most of the contentions presented here. "To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely *and* specific as to its ground. An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22.) To the extent the objections regarding improper legal opinion, legal conclusions, and argument amounting to advocacy were not presented to the trial court before or during trial, they

are forfeited here.[9]  (See *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 564-565.)

Even if these arguments were not forfeited, we disagree with the Oshodins that any error in admitting the challenged testimony was prejudicial.  We find reversible evidentiary error only where "the error or errors complained of resulted in a miscarriage of justice."  (Evid. Code, § 353, subd. (b).)  A review of the complete trial record demonstrates that admission of the challenged expert testimony did not result in a miscarriage of justice.  Other defense witnesses whose testimony is not challenged on appeal, Fire employees Voltan Nagy and Andrew Smidt, gave substantially similar testimony about the obligations of insureds and insurers.  Nagy also testified that it is "not possible" to provide full and complete insurance coverage for "everything" inside a house.  He stated, "[i]n my 28 years, I don't know of anybody who would think or assume that everything that I have or want would be covered. It's not physically possible.  It's not possible."  Smidt additionally testified about the concept of moral hazard, though he did not use the term: Fire "need[s] to know what they [jewelry] are in order to insure anything more than" the standard $5,000 homeowner's policy sublimit because jewelry is "highly susceptible to theft," "hard to value, and they're small, transportable, easily stolen."  The jury thus had before it

---

[9]     The Oshodins accurately point out that the trial court sustained objections by Fire's counsel when their counsel asked Okey about his "duty."  It is unclear what conclusion they wish us to draw from this, though we note that it suggests both the trial court's receptivity to such objections and an awareness by the Oshodins' counsel that testimony about duty was objectionable.

24

the same evidence the Oshodins now contend was improperly admitted through the expert witnesses.

To the extent the objection to the Nigeria testimony on "racially prejudicial" or general Evidence Code section 352 grounds preserves the contention that the testimony constituted impermissible legal argument, we are not persuaded any reversible error occurred. The Oshodins have not demonstrated a miscarriage of justice from the admission of that testimony. The Oshodins' testimony previously established that they hailed from Nigeria and that Mimi brought the jewelry from Nigeria to the United States. Moreover, Oshodin sought to obtain insurance in the United States, not in Nigeria, where he testified that he did use insurance.

The Oshodins properly preserved their current contention that the expert testimony was irrelevant and prejudicial. They contend, as they did in the motion in limine, that the expert testimony served only to confuse the jury because the experts had training and experience not available to a typical insurance consumer. According to the Oshodins, expert "opinions that non-expert lay-person Oshodin should have known that his request to insure 'everything' was impossible, are irrelevant and should have been excluded on that basis." The court did not abuse its discretion in concluding otherwise.

Evidence is relevant when it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including witness credibility. (Evid. Code, § 210.) In a negligence case, a plaintiff must prove the existence of a legal duty, a breach of that duty, and injury proximately caused by the breach. (*Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 288.) "'Breach is the failure to meet

the standard of care.'" (*Ibid.*) When the alleged negligence arises from the provision of professional services, expert testimony is generally required to establish the standard of care the professional must meet. (*Ibid.*) The primary exception to this rule, which the Oshodins appear to invoke without citation here, is the "common knowledge" exception. It is "principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'" (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001.) "The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery." (*Ibid.*) Whether the defendant owed a duty of care to the plaintiff is a legal question for the court, but whether the defendant breached the duty owed is a factual question for the jury. (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772.)

Here, the court reasonably concluded that expert testimony was relevant to the case and beneficial to the jury. Even though most people have had at least some interaction with insurance agents, the standard of care to which an insurance agent is held is outside a layperson's common experience. So too are the processes by which someone requests insurance for millions of dollars' worth of jewelry and other valuable assets, and by which insurance policies for those items are prepared and communicated to the customer. "'"[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion would ever

26

be heard.  Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury.  It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness.'" [Citation.]'" (*Summers*, *supra*, 69 Cal.App.4th at pp. 1168-1169.) This was not a "scalpel left inside someone" case, where expert testimony was wholly unnecessary.

The Oshodins point to remarks the trial court made outside the presence of the jury as evidence that the expert testimony was irrelevant: "What's an expert going to say in this case? Either you believe Mr. Okey and what he said in court in which case he did nothing wrong.  Or you believe Mr. Oshodin, or what Mr. Okey said in the deposition, in which case, you know, he blew it big time."  Their reliance on these remarks is not persuasive for at least two reasons.

First, "[w]hen faced with making a difficult ruling or decision, some trial court judges, like anyone else, voice aloud the conflicting arguments in favor of one choice over the other. A judge's remarks may suggest one result, yet the judge arrives at the opposite result. In such circumstances, the appellate court does not use the judge's remarks to impeach the ruling." (*People v. Carter* (2014) 227 Cal.App.4th 322, 324.)  Indeed, the court stated moments later, "I'm eagerly awaiting to hear what these witnesses will claim.  You may change my mind."  The court's oral musings do not demonstrate it abused its discretion.

Second, as the court recognized, this case largely turned on the credibility of witnesses Oshodin and Okey.  The expert

27

testimony was relevant to that credibility determination, even if we were to accept the Oshodins' argument that it was irrelevant to the issues of negligence and negligent misrepresentation. Evidence of the standards of care applicable to both sides of the transaction gave the jury a framework against which to assess the Oshodins' and Okey's testimony about how the policy was obtained and what it covered.  In short, the court did not abuse its discretion by concluding the testimony was relevant and not unduly confusing.

## II.    Jury Instructions

The Oshodins contend the trial court improperly failed to give instructions they requested regarding negligence and reliance.  We disagree.

### A.    Legal Principles

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) "The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Ibid.*)  The trial court "may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomplete." (*Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 44 (*Caldera*).)  The court "also may refuse an instruction when the legal point is adequately covered by other instructions." (*Ibid.*)

We review the propriety of jury instructions de novo. (*Caldera, supra*, 25 Cal.App.5th at p. 44.)  "In considering the accuracy or completeness of a jury instruction, we evaluate it in

28

the context of all the court's instructions.  [Citation.]  We will not reverse the judgment for instructional error unless the error results in a miscarriage of justice, i.e., "'where it seems probable" that the error "prejudicially affected the verdict.""'  (*Id.* at p. 45, quoting *Soule*, *supra*, 8 Cal.4th at p. 580.)

### B. Negligence

#### 1. Background

The trial court instructed the jury with a modified version of CACI No. 2361, the pattern jury instruction on negligent failure to obtain insurance coverage.[10]  The given instruction stated:

"Robert and Mimi Oshodin claim that they were harmed by Fire Insurance Exchange's agent Okason Okey's negligent failure to obtain insurance requested by Mr. Oshodin.  To establish this claim, Robert and Mimi Oshodin must prove all of the following:

---

[10]     The pattern version of CACI No. 2361 provides:

"[*Name of plaintiff*] claims that [*he/she/nonbinary pronoun/it*] was harmed by [*name of defendant*]'s negligent failure to obtain insurance requested by [*him/her/nonbinary pronoun/it*].  To establish this claim, [*name of plaintiff*] must prove all of the following:

1. That [*name of plaintiff*] requested [*name of defendant*] to obtain [*describe requested insurance*] and [*name of defendant*] promised to obtain that insurance for [*him/her/nonbinary pronoun/it*];

2. That [*name of defendant*] was negligent in failing to obtain the promised insurance;

3. That [*name of plaintiff*] was harmed; and

4. That [*name of defendant*]'s negligence was a substantial factor in causing [*name of plaintiff*]'s harm." (CACI No. 2361.)

29

"1.     That Fire Insurance Exchange's agent Okey was negligent in failing to obtain the insurance Mr. Oshodin requested;

"2.     That Robert and Mimi Oshodin were harmed; and

"3.     That Fire Insurance Exchange's agent Okey's negligence was a substantial factor in causing Robert and Mimi Oshodin's harm."

The court rejected at least two other versions of the instruction the Oshodins proposed.  The first, submitted as part of the parties' second amended packet of proposed jury instructions, modified the first element of the pattern instruction to state, "1. That Robert Oshodin requested Fire Insurance Exchange to obtain insurance to cover everything in their home and Fire Insurance Exchange promised to obtain that coverage for him."  While the court was discussing the jury instructions with the parties after the Oshodins' case-in-chief, the Oshodins' counsel explained, "I think that in CACI we have to articulate what was requested."

During that discussion, the Oshodins' counsel also raised their second proposed modification to CACI No. 2361 for the first time.[11] Counsel stated the Oshodins "would prefer it said, 'failing to obtain the requested insurance or advise the Oshodins the

---

[11]     In the operative second amended complaint, the Oshodins alleged only the following in their cause of action for negligence: "72. Defendants owed Plaintiffs the duty of care to provide the insurance coverage that Plaintiffs specifically requested. [¶] 73. Defendants, through their Agent/Ostensible Agent, breached the duty to Plaintiffs by mistakenly failing to take the actions that it was duty bound to take to provide Plaintiffs with the full and complete scope of insurance coverage that Plaintiffs specifically requested."  They did not move to conform the complaint to proof.

30

requested insurance was not available.'"  Notably, their proposed instruction including that language did not include the "everything" language for which they had previously advocated. It stated, with emphases added:

"Robert and Mimi Oshodin claim that they were harmed by Fire Insurance Exchange's agent Okey's negligent failure to obtain insurance requested by Mr. Oshodin *or failing to tell Mr. Oshodin that Fire Insurance Exchange's agent Okey could not provide the insurance coverage requested.*  To establish this claim, Robert and Mimi Oshodin must prove all of the following:

"1.    That Robert Oshodin requested Fire Insurance Exchange's agent Okey to obtain insurance that Mr. Oshodin requested;

"2.    That Fire Insurance Exchange's agent Okey was negligent either by failing to obtain the insurance Mr. Oshodin requested *or by failing to notify Mr. Oshodin that Fire Insurance Exchange could not provide the insurance that Mr. Oshodin requested*;

"3.    That Robert and Mimi Oshodin were harmed; and

"4.    That Fire Insurance Exchange's negligence was a substantial factor in causing Robert and Mimi Oshodin's harm."

The Oshodins' counsel asserted that the modification was necessary because the pattern instruction "limits the acts of negligence."  After a lengthy discussion about whether the evidence had shown that the insurance was unavailable and that Okey knew the insurance was unavailable, the court denied the request.

The Oshodins' counsel raised the issue again the following day, asserting that "negligence is not limited to the failure to procure."  Counsel argued that Okey (and thus Fire) was also

31

negligent "if it's something that can't be [done] or it's something unavailable, he's negligent in failing to disclose, to recognize that it was unavailable and to disclose it." After additional discussion and argument, the court again denied the modification. The court told the parties that they were welcome to argue about whether the insurance was unavailable, but it did not "want to get involved in this factual debate" through the instructions.

The issue arose a third time during a discussion of the instructions on negligent misrepresentation. The Oshodins' counsel asserted that Okey made an affirmative misrepresentation "when he comes back and says he has provided" the requested insurance. She suggested that was distinct from Okey's "failure to tell Mr. Oshodin that it isn't attainable," which she characterized as "an act of negligence." The court stated it was "grouping all that in the negligent failure to obtain." Counsel responded, "But that limits us to language failure to obtain. [*sic*] I'm not sure what that – whether that includes failure to obtain or tell them they couldn't obtain it."

### 2. Analysis

The Oshodins contend their proposed modifications to CACI No. 2361 were "neither argumentative, misleading, or incomplete," and therefore should have been given. They assert that their proposals included "an additional ground for liability— failure to tell Oshodin coverage for 'everything' could not be provided"—and therefore prejudiced their ability to fully present their case. We disagree.

As a general rule, "an insurance agent does not have a duty to volunteer to an insured that the latter should procure additional or different insurance coverage" beyond that which the insured requests. (*Fitzpatrick v. Hayes* (1997) 57 Cal.App.4th

32

916, 927 (*Fitzpatrick*); see also *Vulk v. State Farm General Insurance Co.* (2021) 69 Cal.App.5th 243, 254 (*Vulk*).) "It is up to the insured to determine whether he or she has sufficient coverage for his or her needs." (*Everett v. State Farm General Insurance Co.* (2008) 162 Cal.App.4th 649, 660.) Thus, in the general case, the insurance agent is merely an order-taker, tasked with obtaining the insurance his or her customer requests. The "failure to obtain the type of insurance requested may constitute actionable negligence and the proximate cause of injury" (*Desai v. Farmers Insurance Exchange* (1996) 47 Cal.App.4th 1110, 1120 (*Desai*)), but the failure to recommend additional or different coverage generally does not. The agent has no duty to make particular insurance available, advise the insured of the availability of coverage elsewhere, or "advise them of inadequacies in coverage which plaintiffs should, as reasonable persons, have themselves been aware." (*Gibson v. Government Employees Insurance Co.* (1984) 162 Cal.App.3d 441, 452.)

"The general no-duty rule changes *only* when one of the following three things occurs: (1) the agent misrepresents the nature, extent or scope of the coverage being offered or provided; (2) there is a request or inquiry by the insured for a particular type or extent of coverage; or (3) the agent assumes an additional duty by either express agreement or by holding themself out as having expertise in a given field of insurance being sought by the insured." (*Vulk, supra,* 69 Cal.App.5th at pp. 254-255, emphasis in original; see also *Fitzpatrick, supra,* 70 Cal.App.4th at p. 927.) "To trigger a special duty of care under the first scenario, there must be an affirmative misrepresentation." (*Vulk, supra,* 69 Cal.App.5th at p. 255.) "To trigger a special duty of care under the second scenario, an insured's request for a particular type or

33

extent of coverage must be sufficiently 'targeted' or 'specific' before an insurance agent will be held to have undertaken an obligation to procure the coverage." (*Ibid.*)

The Oshodins contend that Okey had a special duty of care both because he made an affirmative misrepresentation and because "Oshodin's request for coverage for everything in the house was specific." Their reliance on the affirmative misrepresentation exception is misplaced. The trial court "may refuse an instruction when the legal point is adequately covered by other instructions." (*Caldera*, *supra*, 25 Cal.App.5th at p. 44.) The trial court instructed the jury with CACI No. 1903, the pattern instruction on negligent misrepresentation. This instruction adequately covered the only affirmative misrepresentation alleged in the second amended complaint, Okey's indication that the insurance policy covered everything fully and completely.

The Oshodins argue that "Okey's failure to tell Oshodin the coverage he requested was not available was not only negligent misrepresentation, it was also negligence." However, any omission by Okey could not be negligent misrepresentation. For that cause of action, "a positive assertion is required; an omission or an implied representation is not sufficient." (*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243.) For an omission by an insurance agent to be actionable negligence, it would have to arise from a special duty. There could be no special duty based on a negligent misrepresentation, as the jury found none was made here. This takes us back to the second scenario in which such a special duty may be triggered: a "targeted" or "specific" request by the insured

34

for a particular type or extent of coverage. (*Vulk, supra*, 69 Cal.App.5th at p. 255.)

The Oshodins contend that the request to cover "everything in the house fully and completely" met that specificity threshold. Relying on the same body of case law, Fire responds that it did not. The case law supports Fire's position.

In *Free v. Republic Insurance Co.* (1992) 8 Cal.App.4th 1726 (*Free*), the plaintiff insured repeatedly contacted the defendant insurer "to inquire whether the coverage limits of his policy were adequate to rebuild his home. On each occasion he was informed they were." (*Id.* at p. 1729.) An agent made the same representation when the plaintiff's home was destroyed in a fire. (*Ibid.*) When the plaintiff attempted to rebuild his home, he discovered the policy limit was not sufficient. (*Ibid.*) The trial court sustained the insurer's demurrer, but the court of appeal reversed. It explained that the plaintiff "sought to be protected against a very specific eventuality—the destruction of his home," and the defendant "assured plaintiff his coverage was sufficient" rather than apprising him of options for obtaining the desired coverage. (*Id.* at p. 1730.) The court concluded that under these circumstances, "defendants must be deemed to have assumed additional duties, which, if breached, could subject them to liability." (*Ibid.*)

The court in *Desai, supra*, 47 Cal.App.4th 1110, made a similar ruling on similar facts. The plaintiff alleged that he told his insurance agent that he wanted "'100 percent coverage for the cost of repairing or replacing improvements to the property, including any increases for inflation.'" (*Id.* at p. 1114.) The agent responded that the policy provided "100% coverage for the costs of repairs and/or replacement of the improvements to the

35

property including any and all increases in costs of repair or rebuilding in the event of a loss." (*Ibid.*)  It did not. Citing *Free*, *supra*, 8 Cal.App.4th at pp. 1729-1730 as "remarkably similar" and "precisely" analogous, the court of appeal concluded that the plaintiff stated a "viable claim of negligence." (*Desai, supra*, 47 Cal.App.4th at pp. 1120-1121.)  The court characterized the case as an actionable "'failure to deliver the agreed-upon coverage' case," since the agent failed to obtain the specific coverage the insured requested.  (*Id.* at p. 1119.)

In *Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090 (*Paper Savers*), the plaintiff paper bag manufacturer sought a commercial insurance policy.  (*Id.* at p. 1092.)  The parties disputed what was said during the transaction.  As relevant here, the plaintiff claimed that the agent said the "replacement cost coverage" endorsement "would provide full coverage to replace all business personal property in case of a total loss, regardless of the policy limit," and that the plaintiff would be "fully insured against loss." (*Id.* at p. 1093.)  The court of appeal concluded that the special duty could be triggered, because the plaintiff had evidence that "the insurance policy in this case, as in *Free*, covers a 'specific' eventuality, the loss of defined property with a quantifiable value, not personal injury to third parties for which liability may be open-ended." (*Id.* at p. 1098.)  It distinguished a case the parties do not cite here, *Jones v. Grewe* (1987) 189 Cal.App.3d 950 (*Jones*), which "involved a liability policy for which the upper limit of desirable coverage cannot truly be known at the time of purchase."

The final case the parties discuss is *Butcher v. Truck Insurance Exchange* (2000) 77 Cal.App.4th 1442 (*Butcher*). There, the plaintiff claimed that he gave the insurer "a copy of

his current policies that were not being renewed and instructed [the insurer] to secure the same coverage but at higher limits." (*Butcher*, *supra*, 77 Cal.App.4th at p. 1447.) The old policy included coverage for personal injury arising out of malicious prosecution. The policy the insurer procured did not. However, the insurer told the plaintiff that the policy contained the same coverage as the former policy, and never told Butcher he was not able to obtain the malicious prosecution coverage. (*Ibid*.) The plaintiff filed negligence claims against the insurer after it failed to defend him against a malicious prosecution action. The appellate court concluded that "if the facts relating to the purchase of the Truck policy are shown to be as related by Butcher, the trier of fact could find the insureds were misled by [the insurer's] negligent failure to warn that personal injury was not among the coverages of the policy." (*Id.* at p. 1463.) It rejected defendants' contention that the insureds had a duty to read the policy, emphasizing that the cases imposing such a duty did not involve insureds who alleged they were misled by negligent agents. (*Ibid.*)

In all these cases, the court of appeals concluded that the insureds made sufficiently specific requests for insurance to either state a claim for negligence or take their claim to the jury. The Oshodins contend their request that "everything" be "fully and completely" insured is analogous to the requests made in these cases and specific as a matter of law. It is not. These cases involved repeated requests for full rebuilding coverage (*Free*), "100 percent coverage for the cost of repairing or replacing improvements to the property, including any increases for inflation" (*Desai*), the exact same coverage the insured previously had (*Butcher*), and an assurance that all property would be

37

replaced regardless of the policy limit (*Paper Savers*). These requests and assurances are much more specific and narrowly tailored than a general request that "everything" be "fully and completely" covered.

As the court in *Jones* observed, "[a]n insurance policy arises out of the insured's desire to be protected in a particular manner against a specific kind of obligation.  It is the insured's responsibility to advise the agent of the insurance he wants, including the limits of the policy to be issued." (*Jones, supra*, 189 Cal.App.3d at p. 956.)  The request here was essentially limitless, particularly with regard to valuable personal property that is easily moved into or out of a home.  The Oshodins assert that the request was sufficiently specific to give rise to the special duty because it was confined to the house and its contents, to which Okey had access during the walkthrough.  However, it was undisputed that Okey did not see "everything" during his walkthrough—Oshodin did not open Mimi's safe, which he testified contained "unlimited" jewelry—and that Oshodin did not clarify or limit the request in any way.  For instance, it is unclear what he understood "full coverage" to mean; as the Oshodins recognize in their briefing, "[c]osts of repair and replacement vary significantly," yet either may constitute full coverage. Oshodin's request is thus more closely analogous to the requests made in *Vulk, supra*, 69 Cal.App.5th 243 and *Ahern v. Dillenback* (1991) 1 Cal.App.4th 36 (*Ahern*), both of which were deemed to be insufficiently specific to impose a special duty on the insurer.

In *Vulk*, the insured asked the agent "to make sure I had the best policy, and she told me I had full coverage on my house." (*Vulk, supra*, 69 Cal.App.5th at p. 257.)  Although the insured "thought that full coverage meant that I would have enough

coverage to rebuild my home," the court concluded that his request was "vague and conclusory." (*Id.* at p. 258.)  The court further concluded that even if it were to consider an untimely raised argument and questionable evidence that the agent told the insured he had "full coverage," there was no special duty as a matter of law. (*Ibid.*)  It explained that a "nonspecific request for the 'best policy' and a general assurance of 'full coverage' is not the same as a specific request for and assurance of 100 percent replacement cost coverage." (*Id.* at pp. 258-259.)

Similarly, in *Ahern*, an insured requested an automobile insurance policy "that would provide full coverage or the 'best coverage that exists.'" (*Ahern*, *supra*, 1 Cal.App.4th at p. 40.)  She alleged that the agent responded that "she would receive full insurance coverage with policy limits that would safely protect her and her husband." (*Ibid.*)  The insured did not ask for and the policy did not include uninsured motorist coverage.  The insurer consequently denied the insured's claim after she was involved in a collision with an uninsured motorist. (*Id.* at p. 41.)  The trial court granted summary judgment on her negligence claim, and the appellate court affirmed.  It concluded that nothing in the record, including the insured's request and the agent's response, imposed a special duty of care on the agent. (*Id.* at pp. 42-43.)

Because there is no special duty here, the Oshodins' proposed modification of CACI No. 2361 to include "failing to tell Mr. Oshodin that Fire Insurance Exchange's agent Okey could not provide the insurance requested" was not legally accurate.  The trial court accordingly did not err in denying the modification.

39

The trial court also did not err by refusing two special instructions based on *Desai, supra*, 47 Cal.App.4th at pp. 1119-1120 and the "Sources and Authority" instructional notes for CACI No. 2361. The first stated, "An agent's failure to deliver the agreed-upon coverage is actionable." The second stated, "An insurance agent has an obligation to use reasonable care, diligence, and judgment in procuring insurance requested by an insured." The Oshodins assert that the latter "correctly states the special legal duty of care where there is a request for particular coverage by the insured and/or agent represents there is coverage." Similarly, they assert that the former "reflected a special duty." Because a special duty did not exist here, the court was not obligated to give either instruction. Moreover, neither instruction was necessary in the context of the other instructions. CACI No. 2361 focused on the cause of action for negligent failure to obtain insurance coverage; the jury did not need a special instruction stating that such a cause of action existed. Nor did it need what was essentially a restatement of the instructions on the standard of care, CACI Nos. 401 and 600.

The Oshodins also contend the court erred by denying their request to add "everything" to CACI No. 2361. They contend the instruction as given was legally ambiguous, and adding "everything" or "everything in their home" to the instruction "at least makes it clear that Oshodin was looking for full insurance coverage of the house and its contents and that Okey agreed to provide such coverage." The Oshodins have not pointed to any authority in support of their contention that CACI No. 2361 is legally ambiguous absent a description of the insurance requested. Even if we were to conclude it was, we reverse for instructional error only where the error results in a miscarriage

40

of justice.  (*Caldera, supra*, 25 Cal.App.5th at p. 45.) No miscarriage of justice resulted here.  There was no dispute that Oshodin said "everything"; it was the only request the jury had to consider when applying the instruction.

### C.    Reliance

The trial court instructed the jury on the element of reliance with modified versions of CACI Nos. 1907 and 1908.  Those instructions respectively stated, with emphasis added:

CACI No. 1907

"Robert and Mimi Oshodin relied on Fire Insurance Exchange's agent Okason Okey's misrepresentation if:

"1.    The misrepresentation substantially influenced them to purchase insurance for the Lorraine Avenue [*sic*] house from Fire Insurance Exchange; and

"2.    They probably would not have purchased insurance for the Lorraine Avenue [*sic*] house from Fire Insurance Exchange without the misrepresentation; Or

"3.    They did not take alternative measures to protect their personal property because of the misrepresentation.

"It is not necessary for the misrepresentation to be the only reason for Robert Oshodin's and Mimi Oshodin's conduct."

CACI No. 1908

"In determining whether Robert Oshodin's reliance on the misrepresentations was reasonable, they must first prove that the matter was material.  A matter is material if a reasonable person would find it important in deciding what to do.

"If you decide that the matter is material, you must then decide whether it was reasonable for Robert Oshodin to rely on the misrepresentation. *In making this decision, take into*

*consideration Robert Oshodin's intelligence, knowledge, education, and experience.*

"However, it is not reasonable for anyone to rely on a misrepresentation that is preposterous.  It also is not reasonable for anyone to rely on a misrepresentation if facts that are within their observation show that it is obviously false."

The Oshodins contend these instructions "did not reflect testimony that Oshodin could not read."  They therefore proposed the following special instruction: "An insured should be able to rely on an agent's representations of coverage without independently verifying the accuracy of those representations by examining the relevant policy provisions."  The court refused the instruction.  The Oshodins contend this was prejudicial error because Fire's experts "faulted Oshodin for not reading the policy."

The trial court properly refused the instruction.  The italicized portion of CACI No. 1908 specifically directed the jury to consider Oshodin's "intelligence, knowledge, education, and experience."  His literacy or lack thereof is encompassed within those factors.  The Oshodins dispute this but do not provide any authority supporting the notion that literacy is outside the realm of knowledge, education, and experience.  They also contend that their proposed instruction "reflects California case law that where there is a Special Duty of Care based on an agent's representation the request for coverage has been fulfilled, there generally is no duty on the part of the insured to read the policy."  This argument fails in light of our conclusion that there is no special duty here.

## III. Demurrer
### A. Background

The trial court sustained Fire's demurrer to two causes of action in the Oshodins' second amended complaint: breach of oral contract and breach of the covenant of good faith and fair dealing. The court found that the Oshodins' allegations of an oral contract for insurance were insufficiently specific to state a cause of action. It then concluded that absent a properly stated cause of action for breach of contract, the Oshodins' cause of action for breach of the covenant of good faith and fair dealing could not stand. The court denied leave to amend on both causes of action, concluding it was "improbable" that the Oshodins could state either cause of action because their allegations were "substantially similar" to those successfully demurred to in the first amended complaint. The Oshodins contend the court erred by sustaining the demurrer.

### B. Analysis

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. [Citation.] Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment. The plaintiff bears the burden of proving an amendment could cure the defect." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) In the second amended

43

complaint, the Oshodins alleged that an oral contract for insurance was formed when Okey responded affirmatively to Oshodin's request to insure everything in the house fully and completely. They alleged, "That from the time of acceptance of Plaintiffs' request for the specified coverage by Agent Okey, an oral agreement came to exist between Plaintiffs and Defendants providing Plaintiffs with the full and complete coverage that Agent Okey promised to secure (as requested by Plaintiffs), and continues to date." They further alleged that no written policy was ever delivered; the insurance policy consisted entirely of the oral contract.[12]

The trial court concluded, and we agree, that the allegations in the second amended complaint were insufficiently specific to support the existence of an oral contract for insurance. "In order for acceptance of a proposal to result in the formation of a contract, the proposal 'must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain.'" (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811, quoting 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 145, p. 169.) To meet that threshold, the terms of the contract must provide a basis for demonstrating the existence of a breach and providing an appropriate remedy. (*Ibid.*) If an alleged contract "does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract." (*Ibid.*; see also *Bustamante v. Intuit, Inc.* (2006) 141

_____

[12]    This allegation was arguably undercut by Exhibit 2 to the second amended complaint, a written policy renewal offer stating that a written declaration page was sent as an enclosure.

Cal.App.4th 199, 209.) In the context of insurance, the insured has the burden of proving the existence of a contract and its terms as well as the loss. (*Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 438.) Even where the oral contract is preliminary, pending the issuance of a written policy, the policy must be "'specific, either by express terms or implication, as to the subject matter, period, rate, and amount of insurance.'" (*Parlier Fruit Co. v. Fireman's Fund Ins. Co.* (1957) 151 Cal.App.2d 6, 21.)

The Oshodins alleged that the contract for insurance consisted of full and complete coverage for everything, for an indefinite time period. They also attached premium checks and a renewal offer, from which the rate may be deduced. The second amended complaint is silent regarding the types of risks against which the Oshodins were insured, such as fire, flood, earthquake, or theft; the sort of recompense the Oshodins were to receive in the event of an insured risk, such as repair or replacement costs; and the amount of insurance provided by the alleged policy. Without allegations regarding these material terms, there is no way to know what insurance the parties allegedly agreed to, what terms were breached, and what the appropriate remedy would be.

The Oshodins have not proposed any amendments to rectify these deficiencies. Instead, their argument in its entirety consists of an assertion that the second amended complaint "was specifically pled and established each [ ] element" and an assertion that "California case law provides that a cause of action in contract exists for failure to procure requested coverage." While they are correct on the latter point (see *AMCO Ins. Co. v. All Solutions Ins. Agency, LLC* (2016) 244 Cal.App.4th 883, 890), the contract alleged here was a contract for insurance, not a contract to procure insurance. The Oshodins have not provided

any citations to the second amended complaint regarding the existence of a contract to procure insurance, or what the terms of that contract were. An appellant bears the burden of showing error, and that showing was not made here.  Moreover, even if it were, we discern no probability of a more favorable outcome at trial.  (See *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.)  A breach of contract claim for failure to obtain insurance is an alternative theory to the negligence claim the jury squarely rejected at trial; nothing in the record or the Oshodins' briefing suggests a breach of contract claim would have had a higher likelihood of success.

The Oshodins also contend the trial court erred in sustaining Fire's demurrer to their claim for breach of the implied covenant of good faith and fair dealing.  This contention necessarily fails. "'The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract.'"  (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 711.) "The covenant does not exist independently of the underlying contract." (*Id.* at p. 712.) Because the trial court properly sustained the demurrer to the breach of contract claim, there is no contractual claim on which the breach of the implied covenant may rest.

## IV.  Expert Fees

### A.  Background

After trial, Fire submitted a memorandum of costs seeking a total of $668,817.60.  $537,141.85 of that amount was for expert fees, including fees for the three experts who testified at trial, Pickens, Marchel, and Hedges, and two experts who testified at

an Evidence Code section 402 hearing held before trial. The trial court partially granted the Oshodins' motion to tax costs, including $82,940.59 in expert fees it concluded were not reasonably necessary. The court also taxed $60,319.10 in expert fees that Fire incurred prior to the Oshodins' rejection of its Code of Civil Procedure section 998 ("section 998") settlement offer. The trial court concluded the $25,000 settlement offer was reasonable and therefore permitted Fire to recover reasonably necessary expert fees it incurred beyond that point. It ultimately awarded Fire a total of $484,834.16 in costs.

The Oshodins contend the trial court abused its discretion by concluding that Fire's $25,000 settlement offer was reasonable. They further contend that the court abused its discretion by awarding fees for the experts who testified at the Evidence Code section 402 hearing and by not finding the testimony of the experts who testified at trial "was cumulative and impermissible legal and argumentative testimony."

## B. Analysis

"Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) Allowable costs must be both "reasonable in amount" and "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (Code Civ. Proc., § 1033.5, subds. (c)(2), (3).) The trial court may disallow the recovery of costs it deems unnecessary. (*Perko's Enterprises, Inc. v. RRNS Enterprises* (1992) 4 Cal.App.4th 238, 245.)

A plaintiff's rejection of a settlement offer made under section 998 also may impact the cost award. In general, expert witness fees are not recoverable. (Code Civ. Proc., § 1033.5, subd.

47

(b)(1).)  However, if the plaintiff rejects an offer and "fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her post offer costs and shall pay the defendant's costs from the time of the offer.  In addition, in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant. (Code Civ. Proc., § 998, subd. (c)(1).)

The purpose of section 998 is to encourage settlement without the need for trial.  (*Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1483 (*Adams*).)  "[A] good faith requirement must be read into section 998 to effectuate the purpose of the statute.  Good faith in turn requires that the settlement offer be 'realistically reasonable under the circumstances of the particular case.' [Citation.]  The offer must therefore 'carry with it some reasonable prospect of acceptance.  [Citation.]' [Citation.]  On one hand, a party having no expectation that his offer will be accepted 'will not be allowed to benefit from a no-risk offer made for the sole purpose of later recovering expert witness fees.' [Citation.]  One [*sic*] the other hand, section 998 punishes a party who refuses a reasonable settlement offer, and subsequently fails to receive a more favorable judgment at trial." (*Ibid.*)

"Whether a section 998 offer was reasonable and made in good faith is a matter left to the sound discretion of the trial court, and will not be reversed on appeal except for a clear abuse of discretion." (*Barba v. Perez* (2008) 166 Cal.App.4th 444, 450.)  That is a high bar; we reverse the trial court's determination only

if we find "that in light of all the evidence viewed most favorably in support of the trial court, no judge could have reasonably reached a similar result." (*Adams*, *supra*, 199 Cal.App.4th at p. 1484.) "Similarly, the decision to award expert fees, and the determination of whether these fees were reasonably necessary, are issues left to the discretion of the trial court." (*Ibid.*)

The Oshodins contend the trial court abused its discretion by concluding that the $25,000 offer was reasonable when it was made in July 2018. We disagree. The trial court explained that when the offer was made, the parties "knew that defendant Okey had admitted to a 'mistake' which led his insurance carrier to settle for the full $1 million limit of his policy. They knew that Plaintiffs claimed $50 million in damages based on the alleged value of the jewelry Plaintiffs lost. They knew that any damages ultimately awarded would be offset by the amount of Defendant Okey's settlement. They knew that Defendant Fire had an argument (which the court had not yet rejected) that the jewelry was uninsurable because it was procured with embezzled funds.[13] They knew that Defendant Fire had an argument that the policy Plaintiffs wanted did not exist and could never exist. They knew that there would be serious issues concerning the valuation of the jewelry. [¶] All this, combined with the fact that Defendant Fire actually did prevail, shows that the offer of $25,000 was 'realistically reasonable' under the circumstances of this case. Even though the offer of $25,000 represented a mere

---

[13]   This theory was the subject of the Evidence Code section 402 hearing for which the Oshodins seek to disallow recovery of expert fees. The trial court ultimately granted the Oshodins' motions in limine to preclude reference to their alleged wrongdoing at trial.

fraction of Plaintiffs' alleged damages, it was coming on top of a $1 million offset that Plaintiffs had already received. Defendant Fire had several good reasons to believe that its liability was zero, as well as good reasons to believe that any liability a jury might find would be covered by the offset. In that situation, an offer of $25,000 represented a 'reasonable prediction' of what Defendant Fire would have to pay following trial." This thorough explanation, the salient facts of which the Oshodins do not dispute, demonstrates that the trial court carefully weighed the relevant considerations; it does not evince an abuse of discretion.

The Oshodins note that the trial court denied Fire's motion for summary judgment, and assert that "a finding of liability by a jury was reasonably possible, even probable" in light of Okey's deposition testimony. They thus characterize the $25,000 offer as a "token or nominal offer" that could not satisfy the reasonableness requirement given their $50 million demand. (*Wear v. Calderon* (1981) 121 Cal.App.3d 818, 821.) This characterization ignores the fact that the offer also provided that each side would bear its own costs. A "section 998 offer has value beyond the monetary award provided if it also includes a waiver of costs." (*Adams*, *supra*, 199 Cal.App.4th at p. 1485.) Acceptance of the offer thus would have eliminated the Oshodins' exposure to the substantial expert fees they should have known were likely to be incurred given the posture of the case and the parties' litigation strategies at the point the offer was made. Moreover, "[e]ven a modest or 'token' offer may be reasonable if an action is completely lacking in merit." (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134.) A defendant who has concluded that it has a very significant likelihood of success at trial thus reasonably may make a modest settlement offer. (*Bates v.*

*Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 220.) A judgment more favorable to the defendant than the offer it tendered is prima facie evidence that the offer was reasonable. (*Id.* at p. 221.) "It is the plaintiff's burden to show otherwise" (*ibid.*), and the Oshodins have not met that burden here.

The Oshodins also have not demonstrated that the court abused its discretion by awarding fees for the experts who testified at trial or those who testified at the Evidence Code section 402 hearing. As discussed above, the expert testimony at trial was relevant and was not properly objected to on the grounds of impropriety they now allege. The Oshodins assert that the experts who testified at the Evidence Code section 402 hearing were not reasonably necessary, because "the defense theory of wrongdoing in Nigeria was unsubstantiated by any admissible evidence or proven charges and remains so." However, as the trial court cogently explained, "an expense does not become unnecessary simply because the party incurring it lost on that discrete issue." A defendant is entitled to engage the services of experts to dispute its liability to the plaintiff (*Bates v. Presbyterian Intercommunity Hospital, Inc.*, *supra*, 204 Cal.App.4th at p. 220), and that is what Fire endeavored to do during the Evidence Code section 402 hearing.

The Oshodins did not object below that the expert testimony at trial should have been limited as cumulative, nor did they properly raise the argument in their briefing here by simply asserting that the testimony was cumulative. Even if that argument were preserved and properly presented, however, we would find no abuse of discretion. The trial court reasonably

51

could have concluded that each expert brought a different perspective to the issues about which he testified.

## DISPOSITION

The judgment and cost award are affirmed.  Fire is entitled to recover its costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P. J.


MORI, J.